COLORADO INTERSTATE GAS COM-
PANY, INC., a Delaware corporation,
Plaintiff–Appellee and Cross–Appel-
lant,

v.

CHEMCO, INC., R.E. Neher, Zelda Neher,
G. Hamilton Neher, Robin Neher Cann,
Robin Investment Co., Inc., Kirchner
Farm Associates and Dempsey Invest-
ment Company, Inc., Defendants–Ap-
pellants and Cross–Appellees.

No. 89CA0594.

Colorado Court of Appeals,
Div. III.

Dec. 19, 1991.

Rehearing Denied Feb. 20, 1992.

Certiorari Granted Aug. 17, 1992.

Sparks, Dix, Enoch & Winslow, P.C., R. Kenneth Sparks, Robert M. Wilson, Michael L. Williams and Rebecca H. Noecker, Colorado Springs, for plaintiff-appellee and cross-appellant.

Davis & Ceriani, P.C., Gary J. Ceriani and Michael P. Cillo, Denver, for defendants-appellants and cross-appellees.

Opinion by Judge MARQUEZ.

Defendants, Chemco, Inc., R.E. Neher, Zelda Neher, G. Hamilton Neher, Robin Neher Cann, Robin Investment Co., Inc., Kirchner Farm Associates and Dempsey Investment Company, Inc., (Chemco) appeal the dismissal of their counterclaims for fraud and tortious breach of contract. Plaintiff, Colorado Interstate Gas Company, Inc. (CIG), cross-appeals the judgment entered on the trial court's ruling that it

breached its gas purchase agreement with Chemco and the jury's subsequent damage award. We affirm.

In 1978, Chemco leased oil and gas acreage and recompleted an old well, the Wear 3–2 well. After recompletion of the well, Chemco approached CIG about purchasing the gas. CIG, however, determined that it would not be economical to install or operate the gathering facilities necessary to purchase this gas.

Around the same time, another company drilled a well near the Wear 3–2. CIG concluded that this well was also uneconomical to connect. However, CIG informed both companies that the two wells together might produce enough gas to make it economical for CIG to install and operate the necessary gathering facilities. CIG informed each company that it would consider purchasing its gas only if a suitable contract were signed with each of them. After negotiations, both Chemco and the other company entered into separate contracts with CIG. Chemco's contract was effective April 27, 1979, for a term of 15 years. Problems with the other company's well developed almost immediately.

In 1980, Chemco approached CIG about purchasing gas from several additional wells it intended to rework or recomplete. In September 1980, the parties amended their contract to add the gas from three wells. CIG then constructed new facilities necessary to connect these wells and wells from other sellers. None of these wells produced any significant volumes of natural gas. Another well, the Mundhenke, was never connected.

In late 1983, CIG began negotiating with Chemco regarding the purchase price and the excessive cost of gathering the gas from Chemco's existing wells. In July 1984, CIG and Chemco agreed to amend the contract for two years, effective October 1983, and to amend it permanently thereafter. Testimony was presented that, by 1985, CIG's gathering costs were much higher than anywhere else on its system and were in excess of the amount CIG was allowed to recover for gathering in its sales rate.

In 1985, when CIG was unable to renegotiate the terms of the contract, it exercised what it thought to be its right to cease purchasing the gas under section 4.5 of the contract and brought a declaratory judgment action seeking interpretation of that section. Section 4.5 of the contract provides:

Irrespective of any other provision of this Agreement, whenever the quantity of gas being delivered at any delivery point is or becomes so low that it is not economically feasible for the Seller to deliver or the Buyer to take such gas into Buyer's facilities, either party may elect to discontinue delivering or taking such gas.

Chemco counterclaimed that CIG breached its obligation to take or pay for the gas specified in other provisions of the contract, and it also brought fraud and tortious breach of contract claims against CIG.

By agreement of the parties, trial was bifurcated. In phase I, in April 1988, the court ruled that CIG did not properly exercise section 4.5 of the contract and therefore breached it. Following the phase I trial, the court dismissed all of Chemco's tort claims. In phase II, in March 1989, the jury awarded damages in favor of Chemco for CIG's breach of the agreement.

## I.

CIG now contends that the trial court erred in interpreting its contract with Chemco. We disagree.

■ Interpretation of a written contract and whether ambiguity exists in a contract is a question of law for the court. *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo.1984). Therefore, the trial court's determination regarding the question of ambiguity is not binding on this court. *See Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371 (Colo. 1990).

■ To ascertain whether certain provisions of an agreement are ambiguous,

the language used must be examined and construed in harmony with the plain, popular, and generally accepted meaning of the words employed and with reference to all provisions of the document. *Heller v. Fire Insurance Exchange*, 800 P.2d 1006 (Colo. 1990). In making this determination a court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and the circumstances surrounding the making of the contract. *KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769 (Colo. 1985).

■ Once the contract is determined to be ambiguous, it must be construed in accordance with the intent of the parties, and relevant evidence may be considered to resolve factual questions of the parties' intent. *Chambliss/Jenkins Associates v. Forster*, 650 P.2d 1315 (Colo.App.1982); *see Fibreglas Fabricators, Inc. v. Kylberg, supra.*

■ The intent and purpose of parties with respect to the contract may be gleaned from the parties' conduct, their oral statements and writings, and other evidence illuminating circumstances surrounding making of the contract. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882 (Colo.1986).

■ However, if the terms of a contract are ambiguous, they must be strictly construed against the party drafting the contract. *Green Shoe Manufacturing Co. v. Farber*, 712 P.2d 1014 (Colo.1986).

Once a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues. *Union Rural Electric Ass'n v. Public Utilities Commission*, 661 P.2d 247 (Colo.1983). And, findings of fact made by the trial court are binding on appeal if supported by evidence in the record. *Zuments v. Colorado High School Activities Ass'n*, 737 P.2d 1113 (Colo.App.1987).

■ Evidence presented at the phase I trial indicated that the volume of gas produced from the wells from the times they were added to the contracts to 1985, although declining, remained relatively unchanged. However, CIG argued that the quantity was so low that gathering costs made continuation of the contract no longer economically feasible.

The trial court found, and we agree, that section 4.5 was ambiguous on its face. It then held that the clause could not be exercised primarily on economic considerations and that there must be a significant decline in volume or depletion in well capacity prior to its exercise.

The court concluded that reading the clause to mean that it could be exercised if no significant decline in volume occurred made the provision ambiguous because, if no change in quantity is contemplated, there would be no reason to trigger the application of the provision to quantity and, in such event, the contract could merely state that if the contract is unprofitable, either side can withdraw. Further, it found that, if this was the proper construction, the contract was illusory since there was testimony that the contract was unprofitable from its inception.

Thus, relying on evidence that CIG treated the contract as binding from 1979 to 1985, and on the principle that ambiguous contracts are to be strictly enforced against the drafter, the court ruled in Chemco's favor.

■ In order to determine intent, a contract must be construed as a whole and effect must be given to every provision, if possible. *In re Application for Water Rights of Estes Park v. Northern Colorado Water Conservancy District*, 677 P.2d 320 (Colo.1984).

Section 4.5 provides that the buyer may discontinue taking the gas whenever the quantity of gas "is" so low or "becomes" so low that it is not economically feasible to take delivery. Thus, the terms of the contract indicate that the quantity of gas being delivered must affect the economic feasibility.

Arguably, a substantial reduction of volume is not required as long as the quantity "is" so low that delivery is not economically feasible. However, such a reading

would appear to have made the contract illusory from the beginning since the court found, with record support, that there had not been a significant decrease in production. Further, as the court found, CIG treated the contract as binding, and CIG abandoned the contract, not because of a decrease in quantity, but for other reasons.

Consequently, it is reasonable to conclude that the parties intended the terms "is or becomes" to mean that the quantity must differ significantly from the volumes being produced when the parties entered into the contract.

The trial court also found that the clause "not economically feasible" was not defined and was a subject of varying interpretations. Although the court did not determine what the clause meant or whether the acceptance of delivery by CIG was not economically feasible because of the low quantity of gas being delivered, because of our discussion as to quantity above, we do not address this question. *See Union Rural Electric Ass'n v. Public Utilities Commission, supra.*

CIG's contentions regarding the exclusion of certain parol evidence are without merit.

## II.

CIG also argues that its rights to due process were violated, that all contract issues were not decided in the first trial and that, therefore, those issues should be remanded for trial or, in the alternative, damages awarded on those issues should be set aside. In this regard, CIG asserts that it was denied the opportunity to try the issue of its liability for damages for a well which was not connected and for a well which allegedly was incapable of producing gas. We disagree.

Prior to trial, and pursuant to the stipulation of the parties, the court adopted the following trial procedure:

1. All issues framed by Plaintiff's complaint for declaratory judgment, and any other issues framed by the pleadings with respect to whether Plaintiff has breached the contract with Defendants, shall be heard and determined by the Court, sitting without a jury. Trial of such issues shall commence on April 11, 1988.

2. After hearing all evidence offered by both parties on the declaratory judgment and contract liability issues, the Court will enter its ruling on such issues. Immediately thereafter, the Court will (if necessary) impanel a jury and all remaining issues framed by Defendants' counterclaims will be tried to jury verdict.

3. The Court will reserve ruling on Plaintiff's Motions to Dismiss Defendant's Counterclaims until after ruling on the contract liability issues since it is conceivable that the Court's ruling on the contract liability issues will render those Motions moot.

During trial, CIG acknowledged that the first trial was to determine all contract liability issues. Testimony was presented concerning the two disputed wells. Furthermore, the court found that CIG had breached the contract, that all contract claims had been decided, and that, therefore, contract liability issues could not thereafter be raised. Thus, no contract liability issues remained.

## III.

■ We also reject CIG's claim that the trial court did not apply the proper measure of damages.

Section 4.1(a) of the contract provides in part:

*Gas Well Contract Quantity*—Seller agrees to sell and deliver and Buyer agrees to take and pay for, or failing to take, nevertheless to pay for Seller's interest in a minimum quantity of gas per day, averaged over each Contract Year, produced from each gas well covered hereby.

Further, § 4.2 of the contract provides: FAILURE OF BUYER TO TAKE CONTRACT QUANTITY—*If,* during any of the Contract Years specified in Subparagraph 4.1(a) hereof, *Buyer shall fail to take the gas well Contract Quantity of gas from any well, then Buyer shall*

*pay Seller* on or before the 20th day of the 2nd month of the next following Contract Year *for that quantity of gas which is equal to the difference between the said quantity and Buyer's actual takes during such period.* The amount so paid shall be equal to the price in effect at the time such deficiency occurred, multiplied by the volume of gas for which payment is due Seller, if the date at which such deficiency occurred can be determined; otherwise, the amount so paid shall be equal to the weighted average price for gas well gas delivered hereunder during the period such deficiency occurred, multiplied by the volume of gas for which payment is due Seller. During the 5 years next succeeding the Contract Year in which Buyer has failed to take the gas so paid for, all gas well gas taken by Buyer from Seller which is in excess of the gas well Contract Quantity of gas for the current Contract Year shall be known as Makeup Gas and shall be delivered without charge to Buyer until such excess equals the amount of gas previously paid for but not taken; provided, Buyer shall not be permitted to make up any canceled allowables except to the extent reinstated by duly constituted authority.... Seller agrees to refund monies to Buyer for that portion of the gas well gas previously paid for but not taken which Seller is unable to deliver as a result of any such well not being capable of producing such gas or being disconnected under any of the options granted herein. (emphasis added)

The court instructed the jurors that if they found actual damages, such actual damages should be all take-or-pay payments due Chemco under the terms of the contract.

CIG argues that this puts Chemco in a better position than if the contract had been performed because it results in Chemco receiving the full contract price and also retaining the gas for resale as well as avoiding significant expenses. Thus, CIG contends that the proper measure of damages is the difference between the market price and the contract price less expenses

saved or, alternatively, lost profit as provided by § 4–2–708, C.R.S., of the Uniform Commercial Code (UCC) and the common law. We disagree.

■ Damages are awarded in order to make the non-breaching party whole. The general measure of damages for a contract case is that amount which places the non-defaulting party in the same position he would have been in had the breach not occurred. *Great Western Sugar Co. v. Pennant Products, Inc.,* 748 P.2d 1359 (Colo.App.1987).

Although the UCC applies to gas purchase contracts, *KN Energy, Inc. v. Great Western Sugar Co., supra,* the parties can vary the provisions of the UCC by agreement, § 4–1–102(3), C.R.S., and by agreement may limit or alter the measure of damages recoverable. Section 4–2–719(1)(a), C.R.S.

CIG argues that section 4.2 of the contract provides for alternative performance and as such cannot be a remedy for breach of performance. CIG further contends that, if the contract provision is interpreted as a remedy, it is an unenforceable liquidated damages or penalty provision. We conclude that damages are to be measured by CIG's obligation under the contract.

A take-or-pay contract provides for performance in the alternative. A buyer can either (1) take the minimum purchase obligation of natural gas (and pay) or (2) pay the minimum bill. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677 (10th Cir.1991); *International Minerals & Chemical Corp. v. Llano, Inc.,* 770 F.2d 879 (10th Cir.1985). The take-or-pay clause is a promise in the agreement, not a measure of damages. *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.,* 813 F.2d 77 (5th Cir.1987); *Resources Investment Corp. v. Enron Corp.,* 669 F.Supp. 1038 (D.Colo.1987).

Because one of the alternative performances in a take-or-pay contract is the payment of money, courts have distinguished the "pay" provision from a liquidated damages provision. *Prenalta Corp. v. Colorado Interstate Gas Co., supra; Universal*

*Resources Corp. v. Panhandle Eastern Pipe Line Co., supra.* This distinction is necessary because the payments made pursuant to the take-or-pay provision, the "pay" alternative, are not payments for the sale of gas. *Prenalta Corp. v. Colorado Interstate Gas Co., supra; Diamond Shamrock Exploration Corp. v. Hodel,* 853 F.2d 1159 (5th Cir.1988). Rather, they are payment for the pipeline purchaser's failure to purchase (take) gas. *Diamond Shamrock Exploration Corp. v. Hodel, supra.*

Thus, under the terms of the contract, CIG could elect either to purchase the contract quantity or to pay the value of the contract quantity in exchange for Chemco's tender of the contract quantity of gas or any make-up gas due CIG for past deficiencies. This is clearly an alternative contract which allows CIG to perform either alternative in exchange for Chemco's return performance, rather than a contract which required CIG to "take" the contract quantity of gas with a triggering liquidated damages provision if CIG fails to do so. *Prenalta Corp. v. Colorado Interstate Gas Co., supra.*

However, this type of alternative contract eliminates the availability of one alternative with the passage of time. CIG's "take" alternative is limited to a period of one year, after which CIG is obligated to pay the minimum bill. Therefore, Chemco's damages are measured by CIG's obligation to pay. *Prenalta Corp. v. Colorado Interstate Gas Co., supra.*

Thus, the only way to put Chemco in the same position as if the contract had been performed, especially since this is an ongoing contract through 1994, is for CIG to pay what is required by the contract terms. If and when CIG makes the "pay" payments, it may then be entitled to any refund or recoupment rights available under the contract.

### IV.

Chemco contends that the court erred in dismissing its claims for fraud and tortious breach of contract. We disagree.

After finding that CIG had breached the agreement, the court, upon CIG's motion, dismissed these claims because it concluded that Chemco had not shown an actionable misrepresentation or legal damages and that punitive damages do not lie in a contract action such as this.

Thereafter, Chemco amended its claims, essentially restating the same claims, and the court held that:

> *All* of the defendants' tort claims are dismissed in view of the success on the contract claim. Where the action constituting the purported tort is substantially the same action which constitutes the breach of contract, the claimant is limited to damages pursuant to contract law. (emphasis in original)

### A.

Chemco now argues that there is a special fiduciary relationship between the parties such that they are entitled to punitive damages for CIG's breach of the contract. We disagree.

Colorado law does not recognize a claim for punitive damages predicated upon breach of contract. *Mortgage Finance, Inc. v. Podleski,* 742 P.2d 900 (Colo.1987); *William H. White Co. v. B & A Manufacturing Co.,* 794 P.2d 1099 (Colo.App.1990).

Punitive damages are recoverable only pursuant to statute and are not recoverable for breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable. *Surdyka v. DeWitt,* 784 P.2d 819 (Colo.App.1989).

Generally, breach of the covenant of good faith and fair dealing implied at law in every contract does not give rise to an independent tort claim, and thus, punitive damages are prohibited. An exception to this rule applies in the case of the breach of this covenant by an insurance carrier. *Friedman v. Colorado National Bank,* 825 P.2d 1033 (Colo.App.1991).

Here, the trial court found that the quasi-fiduciary relationship defendant envisioned among the parties did not exist.

Further, Chemco has not established that genuine issues of material fact exist showing that the relation of the parties here is similar to the relation of an insurer to an insured for purposes of the award of punitive damages, and therefore, the court properly dismissed Chemco's claim for punitive damages. *See Friedman v. Colorado National Bank, supra; Mortgage Finance, Inc. v. Podleski, supra.*

### B.

Chemco also asserts that its fraud claims should have gone to the jury. Again, we disagree.

To prevail on a claim of fraud requires proof of a false representation of material existing fact, knowledge on the part of the one making the representation that it was false, and ignorance on the part of the one to whom the representation was made of its falsity, plus a showing that the representation was made with the intention that it be acted on and that the representation resulted in damage. *Concord Realty Co. v. Continental Funding Corp.*, 776 P.2d 1114 (Colo.1989).

■ Elements of fraudulent concealment are concealment of a material existing fact that in equity and good conscience should be disclosed; knowledge on the part of the party against whom the claim is asserted that such fact is being concealed; ignorance of that fact on the part of the one from whom the fact is concealed; the intention that the concealment be acted upon; and action on the concealment resulting in damages. *Eckley v. Colorado Real Estate Commission*, 752 P.2d 68 (Colo.1988).

Essentially, Chemco claims that CIG fraudulently induced it into amending its agreement by representing that "it was doing everything possible to reduce its gas purchase costs"; by failing to disclose CIG's purchases from its affiliates; and by telling Chemco that following the expiration of the 2–year amendment, CIG would continue to honor the contract as amended.

■ One seeking to remedy fraudulent inducement of a contract must elect either to rescind the entire contract to restore the conditions existing before the agreement was made or to affirm the entire contract and recover the difference between the actual value of the benefits received and the value of those benefits if they had been as represented, plus any other damages naturally and proximately caused. *Trimble v. City & County of Denver*, 697 P.2d 716 (Colo.1985).

Here, Chemco elected to affirm the contract as amended.

### 1.

■ The trial court held that the first statement of CIG regarding its efforts to reduce costs was a statement of opinion and that, therefore, it was not actionable in fraud. We agree.

Expressions of opinions are not actionable in fraud. *See Kunz v. Warren*, 725 P.2d 794 (Colo.App.1986); *Two, Inc. v. Gilmore*, 679 P.2d 116 (Colo.App.1984).

### 2.

■ The court also held that any damages awarded upon CIG's contention that it would continue to honor the contract as amended would be the same as for breach of the contract and, therefore, dismissed the claim. Again, we agree with the trial court.

Chemco chose the contract remedy and is not entitled to double recovery. *See Trimble v. City & County of Denver, supra; State Bank of Wiley v. States*, 723 P.2d 159 (Colo.App.1986).

### 3.

■ As to the fraudulent concealment claim, under the facts presented, CIG did not have a duty in equity and good conscience to make the disclosures. *See Berger v. Security Pacific Information Systems, Inc.*, 795 P.2d 1380 (Colo.App.1990). Further, Chemco has failed to show any damage since it has failed to show that the contract as amended would have been worth more to it if CIG had made the disclosures. *See Trimble v. City & Coun-*

*ty of Denver, supra.* Therefore, we also affirm the dismissal of such claim.

Judgment affirmed.

STERNBERG, C.J., and TURSI, J., concur.