AMOCO ROCMOUNT COMPANY, a Delaware corporation, as Unit Operator of, and as an individual interest owner in the Anschutz Ranch East Unit; Champlin Petroleum Company, a Delaware corporation, as an individual interest owner in the Anschutz Ranch East Unit, Plaintiffs–Appellees,

v.

The ANSCHUTZ CORPORATION, a Kansas corporation, Defendant/Third Party Plaintiff–Appellant,

v.

Jerry D. ARMSTRONG; J.H. Bander; Ray O. Brownlie; James B. Wallace; BWAB, Inc.; Chevron U.S.A., Inc.; Mesa Petroleum Company; MTS Limited Partnership; Mobil Rocky Mountain, Inc.; Pan Canadian Petroleum, Inc., Third Party Defendants–Appellees.

Amoco Rocmount Company, a Delaware corporation, as Unit Operator of, and as an individual interest owner in the Anschutz Ranch East Unit, Plaintiff–Appellant,

and

Champlin Petroleum Company, a Delaware corporation, as an individual interest owner in the Anschutz Ranch East Unit, Plaintiff,

v.

The ANSCHUTZ CORPORATION, a Kansas corporation, Defendant–Appellee,

v.

Jerry D. ARMSTRONG; J.H. Bander; Ray O. Brownlie; James B. Wallace; BWAB, Inc.; Chevron U.S.A., Inc.; Mesa Petroleum Company; MTS Limited Partnership; Mobil Rocky Mountain, Inc.; Pan Canadian Petroleum, Inc., Third Party Defendants.

No. 92–8024, 92–8027.

United States Court of Appeals, Tenth Circuit.

Sept. 13, 1993.

Order on Petition for Rehearing for Clarification Oct. 22, 1993.

James M. Lyons (Frederick J. Baumann and Brent R. Cohen also of Rothgerber, Appel, Powers & Johnson, Denver, CO, and James E. Applegate and Alan B. Minier of Hirst & Applegate, Cheyenne, WY, with him

on the briefs), for defendant-appellant/cross-appellee Anschutz Corp.

James A. Clark and Timothy R. Beyer (Fred M. Winner and Peter J. Korneffel, Jr., also of Baker & Hostetler, with them on the briefs), Denver, CO, for plaintiff-appellee/cross-appellant Amoco Rocmount Co.

Before LOGAN, RONEY,* and SEYMOUR, Circuit Judges.

LOGAN, Circuit Judge.

In No. 92–8024, defendant The Anschutz Corporation (Anschutz) appeals the judgment of the district court ruling that it breached a Unit Operating Agreement with plaintiffs Amoco Rocmount Company (Amoco), Champlin Petroleum Company n/k/a Union Pacific Resources Company, and other working interest owners,[1] and ordering it to pay damages of $29,324,113.31. In No. 92–8027, Amoco appeals the judgment of the same court finding in favor of Anschutz on a number of Anschutz's counterclaims against it, and ordering Amoco to pay damages totalling $4,940,585.03.

I

This complex and protracted litigation stems from the discovery in 1979 of a reservoir known as the Anschutz Ranch East Unit (AREU), which Anschutz characterizes as "one of the most significant domestic oil and gas reserve finds since Prudhoe Bay." Opening Br. of Defendant–Appellant at 5. Soon thereafter, the various working interest owners (WIOs) of the AREU commenced negotiations regarding unitization of the field, and the lawyers for the WIOs met frequently over the next two years in an attempt to draft an acceptable agreement. Eventually the parties signed a Unit Agreement and a Unit Operating Agreement, the latter of which is at issue in these cases.

The claim against Anschutz centers on § 5.11 of the thirty-one page Unit Operating Agreement, which we reproduce in its entirety:

*Inability to Market All Gas.* If at any time a Party's share of the gas available for sale exceeds the quantity of gas such Party's gas purchaser will take (excess gas), then every other Party, if requested to do so by the Party owning such excess gas, shall be obligated to share its market for gas with the Party owning such excess. However, if all excess gas cannot be sold, and the Plan of Depletion then in effect will not permit a reduction in the volume of gas produced, then any of such excess gas that must be reinjected or otherwise disposed of will be deemed to be the gas of all Parties such that all Parties will share ratably (in proportion to their ownership of the total volume of gas available for sale) in any deferral of sales or loss which might result from the reinjection or disposal of such excess gas and the costs thereof. The Parties sharing a market for excess gas shall settle their accounts for excess gas sold on a monthly basis. Sales of excess gas by a Party to other than that Party's gas purchaser shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but not to exceed one year. Any such sale shall always be subject to the right of the owner of such excess gas to exercise at any time its right to take in kind, or separately dispose of, its share of such excess gas not previously delivered to a gas purchaser. A Party (hereafter called "Selling Party") who, pursuant to this Section 5.11, shall dispose of another Party's excess gas, shall dispose of such gas in accordance with the terms of the Selling Party's gas sales contract and the Party whose excess gas is being sold agrees to accept and be bound by all terms and conditions of such contract. Further, the Party whose excess

---

\* The Honorable Paul H. Roney, Senior United States Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. Amoco sued in its individual capacity and in its capacity as unit operator, on behalf of the other working interest owners. Champlin joined as a party plaintiff, but the others did not, allowing Amoco to represent them as unit operator. We use "Amoco" to designate all the plaintiffs' interests in appeal No. 92–8024, as well as to identify Amoco in its capacity as defendant on Anschutz's counterclaims.

gas is being sold agrees to indemnify, defend and hold harmless the Selling Party from all claims, demands, suits or causes of action which might arise by reason of such sale of such excess gas.

I Supp.App. of Appellees and Cross–Appellant (hereafter Amoco's Supp.App.) 189.

Before the AREU was discovered, Anschutz had entered into a long-term take-or-pay natural gas sales contract with Natural Gas Pipeline Company of America (NGPL). This contract encompassed the area in which the AREU was eventually found. Anschutz later assigned one-half of its interest in the AREU to Mobil Rocky Mountain, Inc. (Mobil), including a share of the contract with NGPL. Natural gas from the AREU was delivered to NGPL under the contract from June 1984 to May 1987. Because the price of natural gas plummeted during that period, NGPL curtailed its AREU gas purchases beginning in 1986, and both Anschutz and Mobil eventually sued NGPL for breach of the take-or-pay contract. Both suits were settled out of court.

Amoco and the smaller WIOs of the AREU did not enter into gas sales contracts during this period, nor did they sell their shares of gas from the AREU. In 1986 Amoco sued Anschutz, arguing that § 5.11 of the Unit Operating Agreement required Anschutz to share the proceeds of its sales to and settlement with NGPL with all the WIOs of the AREU. Anschutz filed a number of unrelated counterclaims, and the district court, after ruling on various pretrial motions, held a three-phase trial. In its pretrial order, the district court denied Anschutz's motions to dismiss for failure to join indispensable parties and for partial summary judgment.

In the Phase I trial, the district court ruled that § 5.11 required Anschutz to share the proceeds of its natural gas sales with the other WIOs, and rejected Anschutz's contentions that Amoco and the other WIOs had misrepresented to Anschutz that they would obtain separate gas purchasers for themselves. Phase II resolved issues of prejudgment interest, apportionment of Anschutz's settlement with NGPL among the WIOs, and the proper calculation of the WIOs' pro rata

shares of Anschutz's gas sales proceeds. Finally, because Anschutz's counterclaims against Amoco were unrelated to the original claim, Phase III addressed them separately.

## II

Anschutz raises two jurisdictional challenges, which we must resolve before considering the merits. First, it alleges that Amoco has its principal place of business in Colorado, and because Anschutz also has its principal place of business in that state, there is no diversity between them. Second, Anschutz argues that Amoco and the smaller WIOs agreed that the smaller WIOs, some based in Colorado, would not join the suit because to do so would destroy diversity, and that Amoco thereby violated the 28 U.S.C. § 1359 prohibition against the collusive manufacture of federal jurisdiction.

### A

Under 28 U.S.C. § 1332(c)(1), for purposes of diversity jurisdiction "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." The party asserting jurisdiction, here Amoco, bears the burden of proving its existence once it is challenged. *Media Duplication Servs. v. HDG Software, Inc.*, 928 F.2d 1228, 1235 (1st Cir.1991). Further, because the determination of a corporation's principal place of business is a question of fact, we review the district court's ruling under the clearly erroneous standard. *Id.* at 1237. This court has not considered the proper method for determining a corporation's principal place of business since 1966, *see United Nuclear Corp. v. Moki Oil & Rare Metals Co.*, 364 F.2d 568 (10th Cir.), *cert. denied*, 385 U.S. 960, 87 S.Ct. 393, 17 L.Ed.2d 306 (1966), so it is appropriate for us to analyze the various approaches courts have developed since that time for making this determination.

"[T]he courts of appeal now use three tests to determine a corporation's principal place of business: the 'nerve center' test, the 'corporate activities' test, and, most recently (and increasingly popular), the 'total activity'

test." 13B Charles A. Wright et al., *Federal Practice and Procedure* § 3625, at 129 (2d ed. Supp.1993). Under the "nerve center" approach, "a corporation has a single principal place of business where its executive headquarters are located." *Metropolitan Life Ins. Co. v. Estate of Cammon,* 929 F.2d 1220, 1223 (7th Cir.1991). The "corporate activities" test (also known as the "place of operations" or "place of activities" test) "focuses on the state where a substantial portion of the corporation's business is located." *Danjaq, S.A. v. Pathe Communications Corp.,* 979 F.2d 772, 776 (9th Cir.1992). Finally, the "total activity" approach "considers a variety of factors, such as the location of the corporation's nerve center, administrative offices, production facilities, employees, etc., and it balances these factors in light of the facts of each case." *White v. Halstead Indus., Inc.,* 750 F.Supp. 395, 398 (E.D.Ark. 1990). The Seventh Circuit follows the nerve center test, *see Metropolitan Life,* 929 F.2d at 1223, whereas the Fifth and Eleventh Circuits have adopted the total activity test, *see Harris v. Black Clawson Co.,* 961 F.2d 547, 549 (5th Cir.1992); *Vareka Invs., N.V. v. American Inv. Properties, Inc.,* 724 F.2d 907, 910 (11th Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). The Ninth and First Circuits use both the nerve center and corporate activities tests, and have developed methods for choosing which to use in a particular case. *See Danjaq,* 979 F.2d at 776; *Topp v. CompAir, Inc.,* 814 F.2d 830, 834–35 (1st Cir.1987).

■ In their treatise, Wright, Miller & Cooper maintain that the nerve center and corporate activities tests are two sides of the same coin, and that they "can be viewed as particular applications of the general rule that the bulk of corporate activity, as evidenced by the location of daily operating and management activities, governs the choice of a principal place of business." 13B Charles A. Wright et al., *Federal Practice and Procedure* § 3625, at 625 (2d ed. 1984). We agree, and therefore explicitly adopt what was implicit in *United Nuclear,* i.e., that the determination of a corporation's principal place of business does not hinge on one particular facet of corporate operations, but on the total activity of the company considered as a whole.[2] This totality of the circumstances approach avoids the difficult choice between the two other tests, and also provides needed flexibility to address the myriad incarnations of corporate form and operations.

■ In its decision in Phase I, the district court found that Amoco has offices in Colorado and Illinois, that it is a subsidiary of Amoco Production Company (which is itself a subsidiary of Amoco Corporation), and that Amoco's entire *raison d'etre* is to manage Amoco Production's assets in the AREU. It also found that Amoco Production's office in Denver provides management and engineering services to Amoco under a management contract, principally through an office in Wyoming. Amoco's primary responsibility is the management of the AREU as unit operator.

The district court concluded that it need not definitively establish Amoco's principal place of business, but only determine that it

---

**2.** In *United Nuclear,* we did not use any particular label to identify the method by which we would select the principal place of business. In two footnotes, we did cite to *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D.N.Y. 1959), which is credited with developing the nerve center test. *See* 364 F.2d at 570 nn. 8–9. However, the language we used in *United Nuclear* indicates that the entire circumstances of operation were to be considered:

> Where the corporation has its principal place of business is a question of fact to be determined by the character of the corporation, its purposes, the kind of business in which it is engaged, and the situs of its operations.

> Where a corporation carries on its business in a number of states, no one of which is clearly the state in which its business is principally conducted, the state where a substantial part of its business is transacted and from which centralized general supervision of all of its business is exercised, is the state in which it has its principal place of business.

*Id.* at 570 (quotation and footnote omitted). At least one district court in this circuit shares the view that *United Nuclear* endorsed the total activity test. *See Zimmerman Metals, Inc. v. United Eng'rs & Constructors, Inc.,* 720 F.Supp. 859, 861 (D.Colo.1989). Therefore, our adoption of the total activity test does not require us to modify or overrule *United Nuclear.*

was not in Colorado.[3] The district court then applied the "center of activity" test, and determined that because all of Amoco's assets and production activities are in Utah and Wyoming, Amoco's principal place of business was in one of those states, not Colorado.

We have little difficulty upholding the district court's conclusion under the total activity test. The only connection between Amoco and Colorado is the management contract with Amoco Production. Amoco has no employees in Colorado. Amoco's sole function is to operate the AREU as unit operator and to manage Amoco Production's interest in the unit. Therefore, the locus of Amoco's total activities is the AREU, which spans two states, Wyoming and Utah. Anschutz is a Kansas corporation with its principal place of business in Colorado. There is complete diversity between the parties, and jurisdiction was proper in the district court.

**B**

 Some of the nonparty WIOs are residents of Colorado for diversity purposes. Anschutz alleges that Amoco collusively agreed with other WIOs that none would join in this lawsuit who would destroy diversity. Under 28 U.S.C. § 1359, jurisdiction is not appropriate when "any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of [the district] court." This statute "is aimed at preventing parties from manufacturing diversity jurisdiction to inappropriately channel ordinary business litigation into the federal courts." *Yokeno v. Mafnas,* 973 F.2d 803, 809 (9th Cir.1992). As with other challenges to jurisdiction, a party charged with creating jurisdiction by collusion bears the burden of demonstrating that jurisdiction is proper. 14 Wright, *supra,* § 3637, at 94.

Anschutz does not argue that Amoco is merely a "straw man" with no actual interest in the litigation. *See Martinez v. United States Olympic Committee,* 802 F.2d 1275, 1279 (10th Cir.1986); *Hackney v. Newman Memorial Hosp.,* 621 F.2d 1069, 1071 (10th Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 397, 66 L.Ed.2d 244 (1980). Rather, its argument is based upon a litigation agreement between Amoco and the other WIOs, including those whose Colorado residency would destroy diversity if they joined in this suit. The agreement provides that Amoco and the others will share litigation expenses, recovery, and damage assessments from counterclaims in proportion to their interests in the AREU. Amoco promised to consult with the others on litigation strategy, but reserved to itself the final right of decision.

The litigation agreement does not constitute improper collusion under § 1359. The district court first determined that the other WIOs were not indispensable parties under Fed.R.Civ.P. 19(b), and Anschutz has not appealed that decision. Amoco is the unit operator who would normally conduct business, including litigation, on behalf of and for the benefit of the WIOs. The instant case is unusual only in that the suit is against another WIO, Anschutz. In such a case it is appropriate for the unit operator to secure consents for the litigation and agreement to bear the expense in proportion to their respective interests. There is no evidence that this contract was executed to help Amoco retain diversity jurisdiction. Because the joinder of the other WIOs was unnecessary, and because Amoco is an appropriate representative with a very substantial interest in the case, there is no improper collusion. *See Farrell Construction Co. v. Jefferson Parish,*

---

**3.** Although the First Circuit appears to require the court to locate the principal place of business, *see Media Duplication Servs.,* 928 F.2d at 1236 ("In order to find diversity jurisdiction, a federal court must identify the principal place of business of a corporation, regardless of whether the corporation has ever made such an identification for itself."), we agree that such a finding is not always necessary.

[A] party need not always prove the exact location of a corporation's principal place of business; all that is necessary is that he estab-

lish that diverse citizenship does or does not exist. If it can be shown, for example, that the principal place of business is one of two states, and the opposing party is not a citizen of either of them, jurisdiction will be upheld.

Wright, *supra,* § 3625, at 642 (footnote omitted). Diversity jurisdiction is premised upon the parties being from different states; which states those happen to be is not relevant if the party can be served, as long as it is clear that the possibilities do not include states that would destroy diversity.

*La.*, 896 F.2d 136, 143 (5th Cir.1990) (prelitigation agreement between contractor and subcontractor specifying that contractor would sue adverse party on behalf of both of them held not to constitute improper collusion).

## III

Turning to the merits of No. 92–8024, Anschutz raises several allegations of error. It argues that the district court erred (1) in determining that the first sentence of § 5.11 of the Unit Operating Agreement is ambiguous, (2) in refusing to interpret the first sentence to require a "gas purchaser," (3) in not applying a one-year limitation on market sharing found in the fourth sentence of § 5.11, (4) in admitting evidence of a settlement between Amoco and Mobil, and (5) in awarding prejudgment interest. We consider each contention in turn.

## A

██ A federal court sitting in diversity must apply the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Wyoming law will give effect to an express choice of governing law by the parties. *Nelson v. McAdams, Roux & Assocs.*, 688 F.Supp. 1502, 1505 (D.Wyo.1988). The parties agree that the Unit Agreement provides for the application of Colorado law to these disputes, and the district court did so with respect to § 5.11. We review de novo a district court's analysis and interpretation of state law. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

██ Under Colorado law, "[i]nterpretation of a written contract and whether ambiguity exists is a question of law for the court." *Colorado Interstate Gas Co. v. Chemco, Inc.*, 833 P.2d 786, 788 (Colo.Ct.App. 1991), *aff'd*, 854 P.2d 1232 (Colo.1993); *see also Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F.Supp. 1503, 1514 (D.Colo.1992) (construing Colorado law). If a contract is determined to be ambiguous, however, "the meaning of its terms is generally an issue of

fact to be determined in the same manner as other disputed factual issues. Findings of fact made by the trial court are binding on appeal if supported by evidence in the record." *Colorado Interstate Gas*, 833 P.2d at 789 (citation omitted).

██ "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation. Each *word* is to be given meaning if at all possible." *United States Fidelity & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 213 (Colo.1992) (citation omitted). The intent of the parties must be determined from the language of the contract itself, *In re Marriage of Thomason*, 802 P.2d 1189, 1190 (Colo.Ct.App.1990), although "a court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and the circumstances surrounding the making of the contract." *Colorado Interstate Gas*, 833 P.2d at 789. Extrinsic evidence of intent is not admissible until the contract has been judged to be ambiguous. *Thomason*, 802 P.2d at 1190. "To ascertain whether a provision is ambiguous, the court must examine and construe the language in harmony with the plain, popular, and generally accepted meaning of the words employed and with reference to all provisions of the document." *Wota v. Blue Cross & Blue Shield*, 831 P.2d 1307, 1309 (Colo.1992) (quotation omitted). The nature of the transaction forming the subject matter of the contract is also considered. *Thomason*, 802 P.2d at 1190. A dispute between the parties as to the meaning of a particular provision does not itself render the provision ambiguous. *Wota*, 831 P.2d at 1309.

██ We must determine whether § 5.11, and initially the first sentence thereof, is ambiguous. The first sentence reads:

If at any time a Party's share of the gas available for sale exceeds the quantity of gas such Party's gas purchaser will take (excess gas), then every other Party, if requested to do so by the Party owning such excess gas, shall be obligated to share its market for gas with the Party owning such excess.

I Amoco's Supp.App. 189. Anschutz maintains that each WIO must have had a "gas purchaser" before this provision could be invoked; that § 5.11 was to go into effect only when one party's purchaser could not take all of that party's gas and another party's purchaser would take that excess. Although this is a reasonable interpretation, we cannot conclude that this sentence unambiguously requires each WIO to have a gas purchaser. Amoco's equally plausible interpretation is that if a WIO has gas available but no buyer, that owner may invoke § 5.11 to make those WIOs who do have a market share it. Nowhere else in the contract is a requirement for a gas purchaser mentioned, so reference to other provisions is unhelpful in this regard. Applying the "plain, popular, and generally accepted meaning of the words employed," *Wota*, 831 P.2d at 1309, we agree with the district court that the first sentence of § 5.11 is ambiguous as a matter of law with respect to the requirement of a gas purchaser.

### B

■ "Once the contract is determined to be ambiguous, it must be construed in accordance with the intent of the parties, and relevant evidence may be considered to resolve factual questions of the parties' intent." *Colorado Interstate Gas*, 833 P.2d at 789. The district court made extensive findings of fact as to the parties' interpretations of § 5.11, and, under Colorado law, we must accept these findings unless they are clearly erroneous. *Id.*

In arriving at its conclusion, the district court recited, *inter alia*, the following: An Anschutz attorney testified that the working interest owners never addressed the issue of excess gas because they did not expect there to be any. App. of Defendant–Appellant the Anschutz Corp. (hereafter Anschutz's App.) 178. Representatives of Amoco and Champlin testified to their understanding that the section provided for market sharing. *Id.* at 179. Two Anschutz vice presidents testified that their understanding was that each party would have a purchaser. *Id.* at 179–80. Representatives of the smaller WIOs testified that they would not have entered into the agreement if a gas purchaser was re-

quired. *Id.* at 180. At one point in 1985 Anschutz proposed making a payment to Amoco for distribution to the WIOs, but withdrew the proposal three months later. *Id.* at 181. Also in 1985, Amoco considered sharing in Anschutz's contract as an alternative marketing strategy. *Id.* at 183. There was general agreement during contract negotiations that the WIOs agreed to reject the use of an in kind or volumetric balancing system to resolving imbalances in the amount of gas taken by the various WIOs because the nature of the field required nitrogen injection that would decrease the quality of the gas and over time would increase the costs of processing the gas. *Id.* at 192. The district court also recited the minutes of the 42nd meeting of the WIOs in which § 5.11 was discussed, and to which Anschutz did not object, which stated that "new Section 5.11 provides that those parties who don't have a gas market will share proportionately in the market that is available." I Amoco's Supp. App. 222; I Anschutz's App. 178.

Based on this evidence, the district court concluded that

> the reference to "gas purchaser" used in § 5.11 was simply a reference point, and not a prerequisite to market sharing. The testimony and evidence presented to the Court compels the conclusion that the mutual intention of the parties was to share pro rata in any gas market available, regardless of whether a WIO had ever had a gas purchaser.

*Id.* at 192–93. The court noted that virtually all of the testimony presented was self-serving, but in addition to the minutes of the 42nd meeting of the WIOs, it relied more heavily on the testimony of the smaller WIOs, who had a lesser stake in the outcome. Anschutz contends that because the district court also found that the smaller WIOs initially intended to have their own gas purchasers, the court's reliance on testimony by the same individuals concerning the gas purchaser requirement was misplaced. We believe it is not inconsistent for the smaller WIOs to have originally intended to obtain gas purchasers, but to be reluctant to sign an agreement requiring them to do so.

Based on our review of the record, we cannot find clearly erroneous the district court's conclusion that the intent of the parties, to the extent it can be ascertained at all, was that they were not required to have a gas purchaser before invoking the market sharing provisions of § 5.11.

### C

■ The fourth sentence of § 5.11 reads as follows: "Sales of excess gas by a Party to other than that Party's gas purchaser shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but not to exceed one year." I Amoco's Supp. App. 189. Anschutz argues that this sentence limits any market sharing required by the first sentence to one year. The district court disagreed, ruling that it was boilerplate language inserted solely as an income tax precaution, and did not have any substantive effect on the parties' agreement.

■ We agree with Anschutz that the mere fact that contract language is "boilerplate" does not render it without effect. *Adams v. Merrill Lynch Pierce Fenner & Smith*, 888 F.2d 696, 701 (10th Cir.1989). Further, as noted earlier, we examine the contract language as a whole before considering extrinsic evidence of intent. As with the first sentence of § 5.11, this clause is ambiguous. If a party sells gas to someone, the entity buying the gas is the party's "gas purchaser," so it is impossible for "a party" to sell excess gas to someone other than its gas purchaser. We agree with the district court that the only reasonable construction of the sentence is this: Sales of a WIO's excess gas by another WIO to the selling WIO's gas purchaser shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but not to exceed one year.[4] I Anschutz's App. 218, 225.

This then brings us to Anschutz's argument, that the sharing required by the first sentence should extend only for one year. We believe that, taken as a whole, the limita-

tion's purpose is to restrict the right of a selling party to sell the gas of a non-producing party, thereby limiting the control one party could exert over the other. This is consistent with the uncontradicted testimony by various witnesses that the sentence was inserted so that the market sharing provisions would not result in the unit being taxed as a corporation. Under the Internal Revenue Code, the unit could be taxed as a corporation if the smaller WIOs ceded irrevocable authority to a larger owner or to the unit operator to market their gas. The smaller WIOs would then be more like shareholders than partners. *See Morrissey v. Commissioner*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). A smaller WIO's choice to have its gas sold under the excess gas market sharing provisions is not affected by the one year limitation.

### D

■ Anschutz objected at trial to the admission of a settlement agreement between Mobil and Amoco. Because Mobil had purchased an interest in the AREU from Anschutz, as well as part of the NGPL contract, Amoco sought the same market sharing benefits from Mobil as it now does from Anschutz. Amoco and Mobil settled out-of-court, and Amoco offered the settlement agreement as evidence in the suit against Anschutz. Anschutz's objection was overruled, and it now contends that the settlement agreement was irrelevant and should not have been admitted.

■ The decision to admit or exclude evidence is within the discretion of the district court, and will not be reversed absent an abuse of that discretion. *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1048 (10th Cir. 1993). As defined by Fed.R.Evid. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This threshold is low, and we have no difficulty

---

**4.** All parties admit that the phrase "only for such reasonable periods of time as are consistent with

the minimum needs of the industry under the circumstances" is devoid of discernible meaning.

concluding that the Mobil–Amoco settlement agreement reaches it.

Although the agreement specified that Mobil was uncertain about the application and interpretation of § 5.11, Mobil paid Amoco a sum consistent with Amoco's interpretation of that section. Mobil and Anschutz were identically situated with regard to the market sharing provisions of § 5.11, and Mobil's conduct is relevant in determining the meaning of that section. Anschutz contends that the district court relied too heavily on the settlement agreement in various parts of the case, thereby tipping the scales in Amoco's favor. These arguments go to the weight to be given the evidence, not its admissibility, and such inquiries are solely within the purview of the trier of fact. We will not second-guess the district court's evaluation of the evidence properly before it.

### E

■ The district court ruled that, because Colorado substantive law was applicable to the case, it would follow Colorado choice of law rules on prejudgment interest. Those rules require the rendering court to apply the prejudgment interest law of the forum state; so the district court applied Wyoming law to the availability and calculation of prejudgment interest. Anschutz contends that under Wyoming law prejudgment interest should not have been available. Amoco disputes this interpretation of Wyoming law, but initially argues that Colorado law, not Wyoming law, should have been applied to this determination.

Wyoming follows the *Restatement (Second) of Conflict of Laws* on contract issues. *See Cherry Creek Dodge, Inc. v. Carter,* 733 P.2d 1024, 1027 (Wyo.1987); *Prehoda v. Edward Hines Lumber Co.,* 399 F.Supp. 643, 646 (D.Wyo.1975). Section 207 of the Second Restatement states that "[t]he measure of recovery for a breach of contract is determined by the local law of the state selected by application of the rules of §§ 187–188." Here, because the parties selected Colorado law in their contract, § 187 dictates that Colorado law applies. Comment e to § 207 instructs that "[t]he local law of the state selected by application of the rule of this Section determines whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period between the breach of contract and the rendition of judgment." Thus, because § 207 selects Colorado, that state's law of prejudgment interest applies to this case. The district court erred by applying the *whole* law of Colorado, including its conflict rules, rather than just the substantive Colorado law of prejudgment interest. This maneuver, known as a *renvoi,* is appropriate only in limited circumstances not present here. *See Restatement (Second) of Conflict of Laws* § 8(2) & (3) (1971). Thus we must remand this aspect of the case for the district court to reconsider the availability and, if applicable, the calculation of prejudgment interest under Colorado law.

### IV

Upon being sued by Amoco for breach of § 5.11 of the Unit Operating Agreement, Anschutz filed a number of unrelated counterclaims. The district court found in favor of Anschutz on four of them and ordered Amoco to pay $4,940,585.03. In No. 92–8027, Amoco now appeals these rulings.

### A

In 1985 NGPL sought a declaratory judgment absolving it from liability under its long-term take-or-pay contract with Anschutz. As a result, Anschutz hired law firms in Denver and Chicago and counterclaimed for breach of contract. The ensuing discovery and motion practice lasted three and one-half years. In association with the suit, Anschutz incurred $3.6 million in attorneys' fees. The district court found, and Amoco does not dispute, that Anschutz's in-house counsel regularly reviewed the monthly billings of the law firms and found the charges to be reasonable and necessary. The suit was settled in 1988 with Anschutz receiving $46 million, offset by approximately $28.5 million in debts due NGPL by Anschutz, for a net cash recovery of $17.5 million.

Under the final sentence of § 5.11 of the Unit Operating Agreement, "the Party whose

excess gas is being sold agrees to indemnify, defend and hold harmless the Selling Party from all claims, demands, suits or causes of action which might arise by reason of such sale of such excess gas." The district court found that Anschutz notified Amoco of its potential indemnification obligation with respect to the NGPL litigation no later than December 1986, when Anschutz filed its counterclaims against NGPL. The court also found that of the $46 million recovered from NGPL, $17,753,433.99 represented proceeds from gas delivered to NGPL and subject to market sharing under § 5.11. This constituted 38.59% of the total recovery from NGPL, so the district court awarded Anschutz the same percentage of its fees under the indemnification clause, resulting in a $1,389,240 assessment against Amoco.

 Under Colorado law, "an indemnity agreement is subject to the same rules of construction which govern contracts generally. Hence, it should be enforced according to the plain and generally accepted meaning of its language and interpreted in its entirety to give effect to all of its provisions so none are rendered meaningless." *May Dep't Stores Co. v. University Hills, Inc.*, 824 P.2d 100, 101 (Colo.Ct.App.1991); *see also Omnibank Parker Road, N.A. v. Employers Ins.*, 961 F.2d 1521, 1523 (10th Cir.1992). Regarding the proper calculation of the fee award, "[a]n award of attorneys' fees typically represents a finding of fact subject to review for clear error." *United States v. Hardage*, 985 F.2d 1427, 1436 (10th Cir.1993).

 Apparently unable to separate out the exact portion of the legal fees and expenses attributable to the sales of gas subject to § 5.11, the court awarded fees based on the percentage of the recovery attributable to excess gas. We cannot hold that was error, or that the evidence of reasonableness of the fees the attorneys charged was deficient. Thus we affirm the court's holding that "Anschutz may recover its attorneys' fees in the same pro-rata portion which it was required to share its settlement." I Anschutz's App. 268.

The district court went on to calculate the recovery as $1,389,240. *Id.* Amoco argues that the district court miscalculated the correct percentage. In its opening brief it states that this is because the share of the NGPL recovery received by Amoco was approximately $10,652,060, or 23.16% of the total recovery. In its reply brief Amoco states that the $10 million plus figure is in error and Amoco received only $8,365,386.89, or 18.19% of the total recovery. It argues that a proper application of the district court's formula would produce a different figure than the amount awarded to Anschutz. We do not understand how Amoco arrived at either its initial or revised figure; and considering Anschutz's percentage ownership both figures seem suspect. But we receive no enlightenment on this point from Anschutz either, which merely defends the calculations as "not clearly erroneous." Reply Brief of Appellant and Answer Brief of Cross–Appellee at 31. We confess to difficulty understanding the mathematics applied by the court in calculating the gas subject to § 5.11, although the parties appear to understand it, and Anschutz did not appeal the calculation (as opposed to whether § 5.11 applied at all) that produced the $29,324,-113.31 damages involved in appeal No. 92–8024.[5] Because the case must be remanded

---

5. Our confusion arises from the way the court and parties reference "excess gas" under § 5.11. The district court stated in its Phase I order that "[d]uring the period between unitization (December 1, 1982) and the filing of this suit (June 5, 1986), Anschutz sold no more than its working interest owner's share of gas available for sale." I Anschutz's App. 177; but it found "that the mutual intention of the parties was to share pro rata in any gas market available." *Id.* at 192. In its Phase II order the court stated that

non-selling WIOs are entitled to market sharing if and when a selling WIO has available to it a purchaser which will take more than that

selling WIO's share of gas. A market is not *available* to be shared under section 5.11 unless and until a gas purchaser is willing to buy more than the selling WIO's share of gas.

*Id.* at 213. In calculating the amount owed to Amoco under § 5.11, the district court apparently adopted Amoco's "entitlements model." Pl.'s ex. 25, III Amoco's Supp.App. 760. That exhibit is nothing more than a summary, however, and does not provide enough information for us to determine how the calculations were performed. Amoco also has made confusing characterizations as illustrated by the following sentences on consecutive pages of its answer brief: "Under § 5.11, if a WIO sells an amount of gas in excess

on the prejudgment interest issue, we direct the district court to re-review its math on this attorney fee sharing calculation. In all other respects we affirm its determination. We also agree with Anschutz that Amoco is not entitled to indemnification as an offset to its liability on this counterclaim. Amoco's claim, based upon the instant suit against Anschutz, has no relationship to Anschutz's claim for sharing the costs of its NGPL litigation.

## B

■ Under the Unit Operating Agreement, Amoco served as the Unit Operator for the AREU, in charge of the day-to-day operations of the field. In May 1986, the WIOs were concerned about the high gas-to-oil ratio in some of the wells, and a subcommittee debated a number of ways to address the problem. Amoco favored workovers on the problem wells, although previous workovers had been ineffective. The rest of the subcommittee, however, preferred to address the problems on a case-by-case basis. In early June, Amoco notified Anschutz that June production would be 38,000 barrels per day, rather than the 45,000 per day Amoco had previously forecasted, and that in the meantime Amoco was preparing a package of workouts and conversions for the WIOs' consideration. Amoco unilaterally instituted this "change in mode" of operations without prior notice to the WIOs, and later informed them that the original production rates would be restored if they agreed to Amoco's workover proposal, which would cost $12.3 million. The other WIOs eventually agreed, and production levels were restored in July.

In its counterclaim, Anschutz argued that Amoco violated the provisions of the Unit Operating Agreement by its action, and sought damages based on the reduced production levels for June. The district court agreed, and awarded Anschutz $475,326 plus interest. Amoco contends on appeal that the district court applied the wrong standard for unit operator liability, that in any event its conduct did not violate the Unit Operating Agreement, and that Anschutz failed to establish its damages from the reduced production in June.

Under § 15.1.1, the Unit Operator may not "[m]ake any substantial change in the basic method of operation of the Plant, any well or any Unit facility, except in the case of an emergency," without the approval of the WIOs. I Amoco's Supp.App. 205. Amoco's first argument is that the Unit Operating Agreement provides for an enhanced standard before liability attaches to the Unit Operator. Section 13.3 states:

The Unit Operator shall conduct all operations hereunder in a good and workmanlike manner and in accordance with prudent operating practices but the Unit Operator shall not be liable to the Parties for any losses, costs or expenses resulting from any act or omission on the part of the Unit Operator, its agents or employees, save and except such losses, costs or expenses which shall result from the gross negligence or willful misconduct of the Unit Operator, its agents or employees.

*Id.* at 202–03. Amoco misconstrues the purpose and effect of this clause.

■■ Parties to a contract may agree to insulate one or more parties from liability for harm caused by ordinary negligence in the performance of a contractual duty, but such an agreement absolving a party from liability for willful or grossly negligent acts is void as against public policy. 6A Arthur L. Corbin, *Corbin on Contracts* § 1472, at 596–97 (1962). Even when exemption from liability for negligence is not illegal, however, exculpatory clauses are strictly construed. *Id.* at 602. "Colorado adheres to the general rule that parties cannot contract away their own negligence." *ANR Production Co. v. Westburne Drilling, Inc.*, 581 F.Supp. 542, 547 (D.Colo.1984). But Colorado law will uphold an exculpatory agreement if there is no duty to the public, the contract was fairly

---

of its share of the gas sold in that month ('excess gas'), it must share the revenues received for the excess gas with any WIOs selling less than their share of the month's gas sales." Answer Brief of Appellees and Opening Brief of Cross–Appellant

at 4. "Under § 5.11, all AREU gas was 'family' gas, and each WIO would share in the revenues derived from gas sales, regardless of which WIO actually sold gas." *Id.* at 5 (citation omitted).

entered into, and the intention is clearly expressed, depending upon "the nature of the service performed." *Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981). We would have no trouble upholding the application of § 13.3 if this case involved tortious acts related to the performance of the contract, such as an error in dealing with a third party that caused loss to the whole operation. But the issues in the instant counterclaim, and in the two other counterclaims to which Amoco seeks to apply the clause, relate to actions taken deliberately and, as the district court found, in breach of the contract involving shifting costs between the contracting WIOs. Applying strict construction we do not believe the exculpatory language applies to these counterclaims. The breaches at issue here are nonperformance of duties imposed by the contract, and do not hinge on whether the breaching party's failure to perform was negligent, grossly negligent, or willful. Here, Anschutz alleges that Amoco unilaterally and intentionally instituted a "substantial change" in unit operations by reducing production, thereby violating § 15.1.1 and breaching the contract. The district court, aware of but not citing § 13.3, apparently held that section is not implicated; we agree.

■ Amoco argues that its production level decision did not represent a "substantial change in the basic method of operation" of the field requiring WIO approval. The facts found by the district court belie this contention. In the participating area involved, seventeen of the twenty-four wells were affected by Amoco's decision. Further, the Unit Operating Agreement strictly limits the discretion of the Unit Operator. Section 14.1.3 requires the Unit Operator to consult with the other WIOs and to keep them apprised of all important matters, but Amoco never informed these WIOs of its intentions to reduce production, even though it was considering such action two months before it occurred. Under the circumstances, we agree with the district court that Amoco breached § 15.1.1 by reducing production without approval of the other WIOs.

■ Amoco next contends that even if a breach occurred, Anschutz could not prove its damages. It argues that because the unproduced oil and gas remains in the reservoir, Anschutz will receive a windfall if it is awarded damages now and gets its share of the oil and gas when it is eventually removed. However, the West Participating Area (WPA) of the AREU is volatile, and the extent of eventual recovery from it is highly speculative. Anschutz has established exactly how much it lost because of the reduced production, and its inability to forecast future recovery from the WPA does not bar a damage award. "Although an award of damages cannot be based on mere speculation or conjecture, once the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery." *Tull v. Gundersons, Inc.,* 709 P.2d 940, 943 (Colo.1985).

## C

■ Gas produced from the AREU and consumed on the premises for operations is known as "fuel gas." As Unit Operator, Amoco had the responsibility for accounting for the fuel gas consumed and for allocating charges and credits to the WIOs. Before 1986, charges for fuel gas were allocated on a participation basis, but credits for gas consumed were allocated based on production from the various participating areas. This method resulted in Anschutz paying for fuel gas rather than contributing fuel gas in kind. After Anschutz discovered this accounting procedure, Amoco agreed to modify it to allocate both credits and charges based on participation, but refused to apply the modification retroactively. Anschutz argued, and the district court agreed, that Amoco's method breached the contract by not permitting Anschutz to contribute its share of fuel gas in kind, rather than paying for its acquisition from other WIOs. Amoco contends that this ruling disregarded the vote of the WIOs not to apply the accounting change retroactively.

Section 5.6 of the Unit Operating Agreement provides that charges and costs relating to unit operations are apportioned based on either participation or ownership, depending on the situation. Nothing in the agreement provides for the proper allocation of fuel gas credits. However, § 7.2.1 of the Unit Agreement allows the WIOs to contrib-

ute fuel gas in kind, and Amoco's accounting method effectively prevented Anschutz from doing so. We agree with the district court that for a party to avail itself of the in-kind option of § 7.2.1, an accounting method that apportions fuel gas credits on a participation or ownership basis is required, and Amoco's failure to use such a method constituted a breach of contract.[6] Amoco's contention that the WIOs voted not to apply the accounting modification retroactively is of no moment; such action does not absolve Amoco of liability for its breach of the contract.

### D

■ In 1986 Anschutz sought to construct a truck loading facility at the AREU so it could take advantage of higher sales prices in Salt Lake City; the existing pipeline to Salt Lake City did not have sufficient capacity to carry all the AREU oil. Amoco owned the existing pipeline, so Anschutz planned to construct its own pipeline and use the truck loading facility until its pipeline was completed. Under § 5.9 of the Unit Operating Agreement, each WIO had the responsibility for disposing of its share of production, and for paying the Unit Operator for any costs incurred during disposal. Consequently, on October 7, 1986, Anschutz requested Amoco to build, at Anschutz's expense, the truck loading facility. Amoco does not contest its responsibility to act on this request.

Despite Anschutz's request for expeditious consideration, Amoco did not formally respond until December 15, and then only to express concerns over a number of aspects of the proposal. Because of protracted negotiations between the parties, the truck loading facility agreement was not executed until September 18, 1987. By that time Anschutz's pipeline was nearing completion, so Anschutz chose not to go forward with the truck facility. In its counterclaim, Anschutz sought damages from Amoco based upon the increased costs its incurred during 1987 to transfer oil from the AREU to Salt Lake City in the absence of the truck loading

facility. The district court found that Amoco understood that construction of the facility would deprive it of revenue, that it deliberately delayed the approval, and the court ruled that Amoco did not act in good faith in its consideration of the proposal. The court also found that the facility would have been completed by January 1987 if Amoco had acted promptly, and therefore assessed damages against Amoco for Anschutz's increased cost, less the cost of operating the facility had it been in existence from January to September 1987.

■ Under Colorado law, "[e]very contract contains an implied duty of good faith and fair dealing." *Wheeler v. Reese*, 835 P.2d 572, 578 (Colo.Ct.App.1992), *cert. denied* (Colo. Aug. 31, 1992). The evidence supports the district court's finding that Amoco knew of the economic repercussions of construction of the facility, and that its delays were related to those concerns. Further, had Amoco acted promptly, the facility could have been built during the fall construction season and would have been operational in January 1987. Therefore, the district court's ruling as to liability was correct and its calculation of damages was not clearly erroneous.

### E

Amoco argues that Colorado, not Wyoming, law applies to the issue of prejudgment interest. We agree. We set out our reasoning in Part III–E above. The same analysis applies to the damage awards we affirm with respect to the cross-appeal. All were based on breach of a contract that specified Colorado law should govern. Thus, we remand on this issue for the district court to reconsider the availability and, if applicable, the rate of prejudgment interest under the law of Colorado.

The judgment of the district court is AFFIRMED except with respect to the prejudgment interest issues. On remand the court is also directed to re-examine its calculation of the sharing of attorneys' fees and costs with respect to the NGPL litigation.

---

**6.** As with Anschutz's claim for the unilateral change in operations, Amoco argues that § 13.3's heightened standard for Unit Operator liability is applicable. This claim by Anschutz is based upon a breach of the contract, however, and our analysis in Part IV–B above controls.

ORDER

Filed October 22, 1993

The court grants plaintiffs-appellees' petition for rehearing for clarification of prejudgment interest order. Because the district court did not apply Colorado law, and the parties did not brief on appeal whether Colorado law required or permitted prejudgment interest and, if applicable, at what rate, we remanded for redetermination on both prejudgment interest issues.

Although the change in the dollar award may be significant because of the amount involved, our reversal was not for any trial court errors affecting basic liability issues. Therefore, we believe *Northern Natural Gas Co. v. Hegler,* 818 F.2d 730, 737–38 (10th Cir.1987), and *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1097 (10th Cir.1991), control and we direct that with respect to the judgments in both the appeal and the cross-appeal, prejudgment interest, if applicable, terminates on the entry of the original judgment, not the entry of judgment on remand, and that postjudgment interest applies thereafter.