**SHELL ROCKY MOUNTAIN PRODUCTION, LLC, a Delaware limited liability company, Plaintiff/Counter–Defendant,**

v.

**ULTRA RESOURCES, INC., a Wyoming corporation, Defendant/Counter–Plaintiff.**

No. 02–CV–1039–B.

United States District Court,
D. Wyoming.

May 30, 2003.

Mark W. Gifford, Casper, Phillip D. Barber, Denver, CO, for Plaintiff.

John R. Vincent, Riverton, T. Brooke Farnsworth, Farnsworth & VonBerg, Houston, TX, for Defendant.

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON OPERATORSHIP, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON WELL COSTS, AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

BRIMMER, District Judge.

This case arises out of ongoing disputes over the operation of oil and gas wells on jointly leased properties in Sublette County, Wyoming. The matter is before the Court on: (1) Defendant and Counter–Plaintiff Ultra Resources, Inc.'s ("Ultra") Motion for Partial Summary Judgment;

(2) Plaintiff Shell Rocky Mountain Production, LLC's ("Shell") Motion for Summary Judgment on Operatorship; and (3) Shell's Motion for Summary Judgment on Well Costs. After reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### *Statement of Parties and Jurisdiction*

Shell is a Delaware limited liability company whose principal place of business is Texas. Ultra is a Wyoming corporation whose principal place of business is either Colorado or Wyoming. This Court exercises diversity jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391(a), (c).

### *Background*

In order to resolve prior disputes, the parties entered a Settlement Agreement ("Settlement") in an underlying suit in which Ultra was a defendant and Shell (then known as McMurry Energy Company, LLC) was a plaintiff.[1] The Settlement references a 1996 Farmout Agreement ("Farmout Agreement") between the parties' predecessors in interest. The parties also executed several Joint Operating Agreements ("JOAs") in conjunction with the Settlement. The Settlement essentially provides that the party with the majority ownership of jointly held working interests will be the operator of wells drilled on the joint leasehold acreage. Shell holds the majority interest in Farmout Lands, and Ultra holds the majority interest in Non–Farmout Lands. On the surface estate, these Farmout and Non–Farmout Lands alternate with each other in a checkerboard pattern.

In the spring of 2002, Shell proposed the drilling of a new well (the "Riverside 2–14 Well"). The well was proposed for a depth of 12,500 feet; however, for this block, Farmout Lands were limited to a depth of 9,931 feet. The lands below that depth ("earnings depth") were Non–Farmout Lands. Thus, Ultra immediately protested that it should be Operator, since the well would encroach into lands where it held a majority interest. However, Shell persisted that it would be Operator of the Riverside 2–14 Well.

Other wells are also at issue in this case. These wells are all located on the surface of Farmout Lands and drilled vertically to below the earnings depth, so that their bottom-hole is located in lands where Ultra owns the majority interest.

On June 28, 2002, Shell filed a declaratory judgment action to enforce the Settlement. All of the wells at issue have a surface location on Farmout Lands, where Shell holds the majority interest, and are drilled vertically so that their bottom-hole location is in lands where Ultra holds the majority interest. Shell requests a declaration that it is Operator of these wells.

On July 18, 2002, Ultra filed a Complaint against Shell in Sublette County, Wyoming, seeking: (1) damages for breach of the Settlement by Shell, and an order requiring compliance with the Settlement; and (2) reformation of the JOAs to make them comply with the terms of the Settlement. Shell filed a timely Notice of Removal on August 7, 2002. On November 15, 2002, this Court entered an Order that consolidated both cases for all purposes. When Ultra filed its Answer to Shell's Complaint in federal court, it included three counterclaims. The first two repeat Ultra's two Claims for Relief listed above. The third is for breach of the JOAs by imposing excessive drilling and operations costs.

---

**1.** The Settlement refers to McMurry Energy Company, but for the sake of simplicity, the name of Shell will be substituted when the Settlement is quoted.

### Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court views the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).

The party moving for summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the nonmoving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to establish the existence of an essential element of the claims on which it bears the burden of proof at trial. *Id.* "While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the nonmovant's claim." *Jenkins*, 81 F.3d at 990.

To satisfy this burden, the nonmoving party must go beyond the pleadings and designate specific facts to make a showing that there is a genuine issue for trial. *Ford v. West*, 222 F.3d 767, 774 (10th Cir.2000). In order to successfully resist summary judgment, there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, a "mere . . . scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir.1997).

### Analysis

#### I. *Standards for Contract Interpretation.*

When the contract is clear and unambiguous, a court's inquiry into the parties' intent is limited to the four corners of the contract. *Amoco Prod. Co. v. EM Nominee P'ship Co.*, 2 P.3d 534, 540 (Wyo.2000). "[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them." *Id.* The interpretation of an unambiguous contract, as well as the existence of any ambiguities, is a question of law for the court. *Id.* "Extrinsic evidence is not admitted to contradict the plain meaning of an unambiguous contract." *Prudential Preferred Props. v. J & J Ventures, Inc.*, 859 P.2d 1267, 1271 (Wyo.1993).

When "two instruments are executed as the evidence of one transaction, they shall be read and construed as one instrument." *Slane v. Curtis*, 39 Wyo. 1, 269 P. 31, 33 (1928) (internal quotation marks and citation omitted). General terms and provisions in a contract yield to specific ones, if the two provisions are not reconcilable. *Landen v. Prod. Credit Ass'n of Midlands*, 737 P.2d 1325, 1328 (Wyo.1987).

A court must avoid construing a contract so as to render one of its provisions meaningless, since each provision is presumed to have a purpose. *Wyo. Game & Fish Comm'n v. Mills Co.*, 701 P.2d 819, 822 (Wyo.1985). If possible, a court should also avoid a construction leading to a conclusion that inconsistent provisions exist in the contract. *Shepard v. Top Hat Land & Cattle Co.*, 560 P.2d 730, 732 (Wyo. 1977). In giving effect to the contracting parties' intent, a court should abide by the rule that "common sense and good faith

are the necessary considerations in contract construction." *Wangler v. Federer,* 714 P.2d 1209, 1213 (Wyo.1986).

## II. *Application.*

### A. The Settlement and the Issue of Operatorship.

■ Shell argues that the Settlement gives it the right to operate all wells drilled vertically on the surface of Farmout Lands, to all depths, regardless of which party holds the majority interest at the bottom-hole location. Ultra responds that under the Settlement, the party with the majority interest at the bottom-hole location of the well is Operator. If the Settlement is clear and unambiguous, then the Court will look no further than the four corners of that document. Section 3.2 of the Settlement reads:

> PLAINTIFFS and DEFENDANTS have also settled all claims and disputes relating to who shall serve as Operator of the Farmout Lands and the Non–Farmout Lands, which lands are described in and are subject to that certain Farmout Agreement .... The surface acreages of the Farmout Lands and the Non–Farmout Lands are described in Exhibits "A" and "B" hereto, respectively. The Farmout Lands are subject to depth restrictions as set forth in the Farmout Agreement and in the Joint Operating Agreements ("JOAs") executed contemporaneously herewith. Except as provided in Sections 3.4 and 4.1 herein, the parties agree that [Shell] shall be the Operator of all wells drilled on a surface location on the Farmout Lands to all depths, under the Joint Operating Agreements ("JOAs") that have been concurrently signed by the parties hereto.... The parties acknowledge that the ownership interests underlying the Farmout Lands may vary depending upon the depth to which a particular well is drilled on the Farmout Lands, and the parties have agreed on a method that will allocate all costs of exploration, drilling, operation and production, as well as all production revenues, on all wells drilled on the Farmout Lands in a manner which is consistent with the ownership interests of the parties at the various depths underlying the Farmout Lands where said costs are incurred and such production obtained, said allocation being set forth in the JOAs that the parties have executed contemporaneously herewith.

(Mem. of Law and Facts in Supp. of Ultra's Mot. for Partial Summ. J.—Exhibits, Ex. 1 ("Settlement"), § 3.2, pp. 4–5). Shell argues that the clear language of section 3.2 gives it the right to operate all wells located on the surface of Farmout Lands *to all depths,* including depths below which Shell has a majority interest.[2] Furthermore, section 3.2 includes a provision acknowledging that ownership interests vary with depth and stating that the parties have a mechanism in place for allocating costs depending on their respective ownership interests. Shell argues that such a provision would be meaningless if it applied only to lands above the earnings depth, since ownerships interests do not vary above that depth. Ultra counters that section 3.2 references the definition of Farmout Lands in the Farmout Agreement, and it also states that "Farmout Lands are subject to depth restrictions." Thus, Ultra contends that section 3.2 only gives Shell the right to operate wells drilled on the surface of Farmout Lands to all depths *within* those Farmout Lands (i.e., above the earnings depth).

---

2. The surface acreages of Farmout Lands and Non–Farmout Lands are described, respectively, in Exhibits A and B to the Settlement.

The language of section 3.2 is plain and unambiguous. While Ultra is correct that Farmout Lands are subject to depth restrictions, the Settlement gives Shell the right to operate "all wells drilled *on a surface location* on the Farmout Lands *to all depths.*" This means that if the well is located on the surface of Farmout Lands, Shell operates the well, regardless of the depth to which it drills. The Court also finds persuasive Shell's argument that the provision regarding varying depths and varying ownership interests evidences the intent that Shell is to operate wells on the surface of Farmout Lands even if they are drilled vertically into Non–Farmout Lands.

■ Although this all appears to be clear, the Settlement contains another provision worth examining. Section 3.4 states:

> The parties acknowledge that restrictions imposed by the Bureau of Land Management or by other regulatory agencies may restrict and limit the number of surface drillsite locations for wells within the area ... which could mean that one vertical and multiple directional wells may need to be drilled from a single drilling pad. Such restrictions could have the result that a well with a surface location on the Farmout Lands may have to be drilled directionally to a legally-permitted bottom-hole location on Non–Farmout Lands or *vice versa.* Thus, notwithstanding any provision herein to the contrary, [Shell] will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Farmout Lands (as defined herein), except Block D which Ultra shall operate subject to Section 4.1, and ULTRA will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Non–Farmout

Lands (as defined herein) and on Block D as provided in the Block D JOA. (Settlement, § 3.4, pp. 5–6).

Shell argues that section 3.4 is an exception to the general rule that the surface location determines operatorship. When agency regulations limit the drillsites for wells, Shell may "spud" a well on the surface of Non–Farmout Lands and drill directionally so that the bottom-hole is located in Farmout Lands; in such a case, Shell would operate the well, even though the well is on the surface of Non–Farmout Lands. Conversely, if regulations made it necessary for Ultra to "spud" a well on Farmout Lands and drill directionally so that the bottom-hole were located on Non–Farmout Lands, Ultra would operate. Thus, according to Shell, section 3.4 covers only directional drilling, which is the only situation where bottom-hole location determines operatorship. As none of the wells at issue here are directional, section 3.4 does not apply.

However, Ultra argues that section 3.4 "trumps" all other sections by its own language—"notwithstanding any provision herein to the contrary." Thus, according to Ultra, section 3.4 is not an exception; rather, it is the standard articulating that "the bottom hole is the bottom line."

An examination of the plain language of section 3.4 reveals that this section is an exception to the general rule that surface location is the dispositive factor regarding operatorship. The discussion of bottom-hole location is encased in the context of the situation where regulations limit the number of drillsites, and thus necessitate directional drilling from the surface of lands where the operator does not own a majority interest. The phrase "notwithstanding any provision herein to the contrary" demonstrates that another standard exists when this regulatory situation is not in play. Certainly, that language would

not be intended to "trump" another expressed standard in all situations; if so, there would be no purpose for the other standard having been expressed in the first place. Furthermore, the nature of section 3.4 as an exception is clearly articulated in section 3.2: "Except as provided in Sections 3.4 and 4.1 herein, the parties agree that [Shell] shall be the Operator of all wells drilled on a surface location on the Farmout Lands to all depths."

■ Moreover, the JOAs also evidence the parties' intent that Shell is to operate all wells drilled on the surface of Farmout Lands to all depths.[3] The JOA that gives Ultra the operatorship of Non–Farmout Lands specifically describes the lands. (*See* Ex. Notebook for Pl. Shell's Summ. J. Mots., Ex. 8, Ex. A, p. 1). This description does not include lands below the earnings depth under the surface of Farmout Lands; rather, it describes the Non–Farmout Lands for which Ultra is Operator based solely on surface location, in accord with the Settlement. (*See id.*).

Having concluded that the Settlement is clear and unambiguous, the Court shall not consider any extrinsic evidence presented by the parties.

B. The Issue of Well Costs.

■ Shell argues that Ultra's counterclaim for breach of the JOAs is barred by the exculpatory clause in Article V, Section A of each JOA. (*See* Ex. Notebook for Pl. Shell's Summ. J. Mots., Exs. 4–8, p. 4 of each). The exculpatory clause states that the Operator "shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct." (*Id.*). Ultra argues that this

clause applies only to tort claims, and furthermore, that it would make no sense to impose a contractual duty, only to take away the ability to enforce that duty in the next part of the same sentence.

This year the Tenth Circuit decided a case involving an exculpatory clause identical to the one at issue here. *See Palace Exploration Co. v. Petroleum Dev. Co.*, 316 F.3d 1110, 1114 (10th Cir.2003). The Court held that the plaintiff "did not articulate any theory of recovery whereby it could recover legal damages based on breach of contract, for the above-referenced exculpatory clause limited [the defendant's] potential liability to willful acts or acts that resulted from gross negligence." *Id.*

The *Palace* decision applies directly to the issue the Court is deciding here. As the Tenth Circuit held, this exculpatory clause bars suit against an operator for breach of contract, or for anything else other than willful acts or gross negligence. *Id.* This Court is bound by that holding. However, the Tenth Circuit went on to explain that

"[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because [it] did not set forth in the complaint a theory on which [it] could recover, 'provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining [its] defense upon the merits.'"

*Id.* at 1117 (quoting *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991)). Therefore, Ultra shall have leave to amend its counterclaim to allege gross negligence or willful misconduct by Shell in allegedly imposing excessive drilling and operations costs.

---

**3.** The Settlement and the JOAs were executed concurrently, and the Settlement references the JOAs. (*See* Settlement, § 3.2, pp. 4–5).

Therefore, the JOAs may be considered together with the Settlement as evidence of the parties' intent. *See Slane*, 269 P. at 33.

### Conclusion

For the aforementioned reasons, Plaintiff's Motion for Summary Judgment on Operatorship and Plaintiff's Motion for Summary Judgment on Well Costs are **GRANTED.** Defendant's Motion for Partial Summary Judgment is **DENIED.** Ultra is granted leave to amend its counterclaim in order to allege gross negligence or willful misconduct. If Ultra elects to amend its counterclaim, it shall make that amendment within twenty days of the date of this Order. Each side shall bear its own costs and attorneys' fees.