# PUBLISH

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

SHELL ROCKY MOUNTAIN
PRODUCTION, LLC, a Delaware
limited liability company,

      Plaintiff-Appellee,

v.

ULTRA RESOURCES, INC., a
Wyoming corporation,

      Defendant-Appellant.

No. 03-8074

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 02-CV-1039-B)**

---

T Brooke Farnsworth of Farnsworth & vonBerg, Houston, Texas (Bennett S.
Bartlett of Farnsworth & vonBerg, Houston, Texas, and John R. Vincent of
Riverton, Wyoming, with her on the briefs), for Defendant-Appellant.

Phillip D. Barber of Phillip D. Barber, P.C., Denver, Colorado (Mark W. Gifford
of Casper, Wyoming, with him on the brief), for Plaintiff-Appellee.

---

Before **SEYMOUR**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Ultra Resources, Inc. (Ultra) and Shell Rocky Mountain Production, LLC (Shell) operate oil and gas wells on jointly leased properties in Sublette County, Wyoming. Shell filed suit in federal district court requesting a declaration that it is the operator of certain wells on the jointly leased properties pursuant to a previous settlement agreement binding the parties. Ultra then filed a complaint in Wyoming state court seeking damages for breach of that same settlement and reformation of certain relevant joint operating agreements to make them comply with the settlement agreement. Subsequent to removal and consolidation of Ultra's state court lawsuit with this action, the parties filed cross-motions for summary judgment. The district court granted Shell's motion, holding, *inter alia*, that the parties' settlement agreement granted Shell the right to operate wells located on surface lands in which it held a majority interest irrespective of the depth to which those wells were drilled. *Shell Rocky Mountain Prod., LLC v. Ultra Res., Inc.*, 266 F. Supp. 2d 1331, 1336 (D. Wyo. 2003). We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm in part, and reverse in part.

I

The predecessors in interest of Shell and Ultra were parties to a federal oil and gas unit located in Wyoming known as the New Fork Unit. Shell's predecessor, the McMurry Oil Company and its partners (McMurry), held an

undivided 25% leasehold working interest to all depths in the New Fork Unit. Ultra's predecessor, Meridian Oil, Inc. (Meridian), was the Unit Operator approved by the Bureau of Land Management (BLM) and owner of the remaining 75% leasehold working interest.

In July 1996, McMurry and Meridian entered into a Farmout Agreement which provided McMurry the right to earn 75% of Meridian's 75% working interest in the leases in the New Fork Unit.[1] The properties in which McMurry had the right to earn Meridian's interest were defined and described in the Farmout Agreement by their surface dimensions. Farmout Lands were limited to five quarter sections in a checkerboard-like configuration and referred to as "blocks." According to the agreement, McMurry would earn 75% of Meridian's 75% interest in the designated Farmout Lands from the surface to "Contract Depth" by drilling an "Earning Well" on each block. McMurry also retained its 25% leasehold ownership in all of the New Fork Unit lands.[2]

Shortly after negotiating the Farmout Agreement, Meridian changed its name to Burlington Resources Oil & Gas Company (Burlington). McMurry and

---

[1]Farmout Agreements are common agreements in the oil and gas business by which the owner of a lease agrees to assign an interest in the lease to another if it drills a well on the lease. *See Moncrief v. Martin Oil Serv., Inc.*, 658 F.2d 768, 769 n.1 (10th Cir. 1981).

[2]After the Farmout Agreement, therefore, McMurry held a 81.25% leasehold ownership interest in the New Fork Unit.

Burlington signed several contracts governing oil and gas operations on the New Fork Unit. In order to provide McMurry the ability to drill and operate wells on the Farmout Lands, the parties entered into a Joint Operating Agreement (JOA) which designated McMurry as the operator of the wells located on those designated tracts. In a separate letter agreement, McMurry and Burlington agreed the JOA would govern all operations on the Unit. Finally, the parties entered into an Agent Operator Agreement in the spring of 1997 by which McMurry executed a Designation of Agent, establishing Burlington as the operator of any well in which it held a majority ownership of the operating rights interest.

In the summer of 1997, Ultra purchased Burlington's interest in the New Fork Unit and McMurry approved the assignment of the Agent Operator Agreement to Ultra. Three years later, McMurry assigned its interest in the Unit leases and the Farmout Agreement to Shell.[3] Shortly thereafter, Shell proposed drilling a well, referred to as the Pinedale 4A, on the New Fork Unit. Ultra protested, declaring that it had the operating rights to that particular well under the relevant Agent Operator Agreement. Due to this and other disputes, Shell filed suit in Wyoming state court in November 2000 (Civil Cause No. 6173). The

---

[3]Although not directly relevant to the instant case, we note that McMurry actually assigned its interest in the New Fork Unit to the newly-formed McMurry Energy Company in May 2000. Shell acquired that company in the fall of 2001 and renamed it Shell Rocky Mountain Production, LLC. To mitigate confusion, we refer to the McMurry Energy Company as Shell.

issues in the litigation included, *inter alia*, who would serve as operator of the wells in the New Fork Unit, how costs and production would be allocated, and whether Shell could drill below the depth to which it had earned interest rights.

On November 2, 2001, the parties entered into a Mutual Release and Settlement Agreement (Settlement). Shell and Ultra agreed to dismiss with prejudice many of the parties' claims and counterclaims (Settled Claims) and submit the remaining claims to binding, non-appealable arbitration (Non-Settled Claims). The companies also decided to terminate the New Fork Unit and enter into new JOAs to govern the lands formerly within the Unit.[4] According to the Settlement and JOAs, the party with the majority ownership of the jointly held working interests would be the operator of wells drilled on the joint leasehold acreage. Shell holds the majority interest in the Farmout Lands while Ultra holds the majority interest in the remaining property or Non-Farmout Lands.

In the Spring of 2002, Shell proposed drilling a new well, referred to as the Riverside 2-14 Well, to a proposed depth of 12,500 feet in a block where the earnings or contract depth was limited by the Farmout Agreement to 9,931 feet. Because the Riverside 2-14 Well would encroach on lands in which it held a

---

[4]At the same time the parties signed the Settlement Agreement and the JOAs, they filed a Stipulated Motion for Stay Pending Arbitration in the Lawsuit, which requested a complete stay of Civil Cause No. 6173 until the Non-Settled Claims were resolved by arbitration. The Wyoming state court granted the stay on December 8, 2001.

majority interest, Ultra claimed it should operate the well. Shell disagreed. As a result, Ultra filed a Motion to Enforce Settlement Agreement under Civil Cause No. 6173, asking the Wyoming state court to enjoin Shell from drilling and acting as operator of the Riverside 2-14 Well. At the conclusion of an expedited hearing, the court issued an order refusing to resolve the operatorship dispute on the merits and denying Ultra's motion to enforce the Settlement. Ultra and Shell continued to disagree over which party was entitled to be the operator of the Riverside 2-14 Well and of all other wells which have a surface and a bottom-hole location underlying the Farmout Lands.

In June 2002, Shell filed this action in Wyoming federal district court seeking a declaratory judgment to enforce the Settlement and to determine which party is entitled to act as operator of the wells in dispute. Ultra responded to Shell's complaint with a motion to dismiss for lack of subject matter jurisdiction, asserting, *inter alia*, that Shell and Ultra are not diverse because both parties have their principal places of business in the same state, Texas. The district court denied that motion, concluding that Ultra did not have its principal place of business in Texas and the parties were thus diverse for purposes of federal jurisdiction. Aplt. App., vol. 1, at 60.

In July 2002, Ultra filed a complaint in Wyoming state court seeking damages for Shell's alleged breach of the Settlement and an order requiring

compliance with the Settlement. It also sought reformation of the JOAs to bring them into compliance with the terms of the Settlement. Shell filed a timely notice of removal, prompting the district court to order removal and consolidate the cases.

Ultra's answer to Shell's federal complaint included three counterclaims. The first two were identical to Ultra's state court claims as detailed above. The third alleged that Shell breached the JOAs by imposing excessive drilling and operations costs. Both parties moved for summary judgment. The district court granted Shell's motion, holding that (1) the Settlement granted Shell the right to operate the wells that were located on surface lands in which it held a majority interest, irrespective of the depth to which those wells are drilled; (2) the Settlement provision addressing directional drilling wells created an exception to the Settlement's general rule for designating well operators; and (3) the exculpatory clauses in the JOAs barred Ultra's excessive costs claim against Shell.

On appeal, Ultra advances several arguments that it claims warrant reversal of the district court's decision to grant Shell's motion for summary judgment. According to Ultra, (1) the district court committed clear error in its determination that Ultra's principal place of business is either Wyoming or Colorado; (2) *res judicata* or claim preclusion bars Shell's sole claim for

declaratory judgment; (3) the district court erred in ruling that the plain terms of the settlement agreement and the applicable JOAs provide Shell the right to operate any well with a surface location on Farmout Lands to all depths; and (4) the district court erred in construing the JOA's exculpatory clause to bar Ultra's claim that Shell breached the competitive rate provisions of the parties' contract. We address each argument in turn.

II

***Diversity Jurisdiction***

Shell brought this civil action against Ultra in Wyoming district court. Ultra filed a motion to dismiss for lack of subject matter jurisdiction on the basis that the parties were not diverse. For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." *Id*. § 1332(c)(1).

It is undisputed that Shell is a Delaware limited liability corporation (LLC) and its principal place of business is Houston, Texas. Thus, Shell is a citizen of both Delaware and Texas. It is also undisputed that Ultra is a Wyoming corporation. The parties are in disagreement, however, as to the location of Ultra's principal place of business. Shell asserts that Ultra's principal place of

business is either Wyoming or Colorado while Ultra contends that it is Texas. The district court agreed with Shell and ruled that Ultra was a citizen of either Wyoming or Colorado, but not Texas.

The trial court's determination of a corporation's principal place of business is a question of fact we review under the clearly erroneous standard. *Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 914 (10th Cir. 1993). "[T]he courts of appeal now use three tests to determine a corporation's principal place of business: the 'nerve center' test, the 'corporate activities' test, and . . . the 'total activity' test." *Id.* at 914-15 (quoting 13B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3625, at 129 (2d. ed. Supp. 1993)). In *Amoco Rocmount*, this court adopted the "total activity" approach to the principal place of business determination, in which a court "considers a variety of factors, such as the location of the corporation's nerve center, administrative offices, production facilities, employees, etc., and it balances these factors in light of the facts of each case." *Id.* at 915 (quoting *White v. Halstead Indus., Inc.*, 750 F. Supp. 395, 398 (E.D. Ark. 1990)). This approach "does not hinge on one particular facet of corporate operations, but on the total activity of the company considered as a whole." *Id.*

Ultra is a wholly-owned subsidiary of Ultra Petroleum Corporation (UPC), which has its offices in Houston, Texas. As a result, "Houston is the location of

most executive and policy decisions, and most business and finance deliberations and negotiations." Aplt. App., vol. 1, at 57. The district court conceded that "Ultra Petroleum's Houston offices may be the 'nerve center' of the Ultra entities as a whole," but correctly noted that "the Tenth Circuit has rejected the 'nerve center' test and has adopted instead a 'total activity' test, in which the company's 'nerve center' is but one factor." *Id.*; *see also Amoco Rocmount*, 7 F.3d at 915. Irrespective of whether Houston constitutes Ultra's nerve center, an evaluation of Ultra's total activity convinces us that there is ample evidence to justify the district court's conclusion that Ultra's principal place of business is either Wyoming or Colorado. *See* 13B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3625, at 633 (2d ed. 1984) ("the legislative history of [§ 1332] supports the conclusion that emphasis typically should be placed on the locus of operations rather than where policymaking functions are carried out").

Ultra has its office address, phone listing, and its most and perhaps only "visible" presence to the public in Colorado. Aplt. App., vol. 1, at 58. Indeed, Ultra's Application for Authority on file with the Secretary of State of Colorado "indicates that its 'principal office' is in Englewood, Colorado." *Id.* at 59; *see also* Aplt. App., vol. 2, at 389-90 (computer and telephone directory searches yield no evidence that Ultra has a telephone listing or physical address in Texas).

-10-

According to Professors Wright, Miller, and Cooper,

> when a corporation has substantial contacts with several states other than
> that of its incorporation, a "visibility" test may be employed to designate
> the place where that corporation's presence is most visible to the public as
> its principal place of business.

WRIGHT ET AL., *supra*, § 3625, at 629-30.  Moreover, Ultra is an oil and gas

exploration and production company whose accounting, engineering/operations,

geology/geophysics, and land functions are located at the Colorado office.  Aplt.

App., vol. 2, at 59.  It follows, therefore, that most of the work relating to

exploration and production of oil and natural gas are planned and directed from

Colorado.  *Id*. at 59-60.

On the other hand, the overwhelming bulk – more than 99% – of Ultra's

land position is located in Wyoming, and the "vast majority" of its capital and

production expenses relate to operations conducted in Wyoming.  *Id*. at 58.  In

fact, more than 99% of Ultra's revenues are generated from Wyoming properties.

*Id*. at 58-59.  "As Ultra['s] . . . business activities are the exploration for and

production of oil and gas . . . Ultra's operations in Wyoming are crucial to the

purposes of its business."  *Id*. at 59 (internal footnote and citation omitted).

Furthermore, "[t]he general rule . . . is that a subsidiary corporation has its

own principal place of business for purposes of diversity jurisdiction, unless it is

merely an 'alter ego' or agent of the parent corporation."  WRIGHT ET AL., *supra*,

§ 3625, at 635.  No argument has been advanced that Ultra is merely Ultra

-11-

Petroleum's "alter ego." In fact, the district court found that Ultra Petroleum "is a separate legal entity from Ultra," Aplt. App., vol. 1, at 57, and "Ultra . . . itself does not have operations [or a physical presence] in Texas." *Id.* at 58 ("Ultra . . . and Ultra Petroleum have been distinguished from one another for various purposes"). Based on the evidence presented regarding Ultra's "total activity," we conclude the district court did not commit clear error in its determination that Ultra's principal place of business is either Wyoming or Colorado, but not Texas. *See Amoco Rocmount*, 7 F.3d at 916 n.3 (a "party need not always prove the exact location of a corporation's principal place of business; all that is necessary is that he establish that diverse citizenship does or does not exist") (citing WRIGHT ET AL., *supra*, § 3625, at 642).

### Claim Preclusion

According to Ultra, Shell's claim that the Settlement and relevant JOAs allow it to operate wells which have a surface location and a bottom-hole location on or under the Farmout Lands is precluded because the issue was already decided by the Wyoming state court in Civil Cause No. 6173. Ultra concedes that it failed to raise the affirmative defense of claim preclusion[5] in its answer or in any filing

---

[5]Typically, this "court employs the terms 'claim preclusion' instead of 'res judicata.'" *Wilkes v. Wyoming Dept. of Empl. Div. of Labor Standards*, 314 F.3d
(continued...)

-12-

before the district court. Aplt. Br. at 34. As a general rule, we do not review matters raised for the first time on appeal. *See, e.g., Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1307 (10th Cir. 2005) ("we do not address issues not ruled on by the district court"). Claim preclusion must be raised as an affirmative defense, and it is waived if not raised in the trial court, *see Kenman Eng'g v. City of Union*, 314 F.3d 468, 479 (10th Cir. 2002); FED. R. CIV. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . res judicata . . . and any other matter constituting an avoidance or affirmative defense."), unless peculiar facts and the interests of judicial economy dictate otherwise. *Lujan v. United States Dept. of Interior*, 673 F.2d 1165, 1168 (10th Cir. 1982).

The instant case presents no "peculiar facts" which provoke us to review Ultra's claim preclusion defense. Unlike in *Lujan*, where there was a state court ruling on the merits on the identical issue presented on appeal, *id.*, here, the Wyoming state court never decided on the merits whether Shell had the right to operate the Riverside 2-14 Well. *See* Aplt. App., vol. 2, at 291-93 (Order Concerning Motion to Enforce Settlement Agreement). According to the state court, "[b]ecause of the conflict between the language of the two contracts

---

[5](...continued)
501, 504 n.1 (10th Cir. 2003).

involved in this dispute, *there is an ambiguity which the Court cannot resolve with the evidence before it at this time.*" *Id*. at 292 (emphasis added). No further proceedings in state court were ever conducted concerning the right to operate the wells in dispute. Indeed, the only other order issued by the state court, subsequent to its order concerning enforcement of the Settlement, was an order confirming the arbitration award. *Id*. at 294-96. Neither the arbitration judgment itself, aple. supp. app., vol. 2, at 570-76, nor the confirmation of that award, aplt. app., vol. 2, at 294-96, address the issue of *operatorship* or the alleged ambiguity between the Settlement and JOAs that the state court failed to resolve in its order concerning enforcement of the Settlement. Moreover, Ultra specifically requested in its answer in the instant case that the district court interpret the Settlement and JOAs, aplt. app., vol. 1, at 45-46, which it did. Because the interests of judicial economy do not demand otherwise, we will not entertain Ultra's claim preclusion defense raised for the first time on appeal.

### *The Operatorship Issue*

Ultra also contends the district court erred in granting Shell's motion for summary judgment on the basis that the plain terms of the Settlement and applicable JOAs provide Shell the right to operate any well with a surface location on Farmout Lands to all depths. We review *de novo* the district court's

-14-

grant of summary judgment and apply the same legal standard employed by that court. *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1270 (10th Cir. 2001). Summary judgment should be granted if the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Keys Youth Servs.*, 248 F.3d at 1270 (quotation omitted).

Both parties sought summary judgment on the operator rights controversy. Shell contended that the Settlement and JOAs provide it the right to operate all wells drilled vertically on the surface of Farmout Lands to all depths, regardless of which party holds the majority interest at the bottom-hole location. Ultra, on the other hand, maintained that the party with the majority interest at the bottom-hole location on a particular well is the operator according to the Settlement and JOAs. The district court held that the terms of the Settlement and contemporaneously executed JOAs unambiguously give Shell the right to operate all wells located on the surface of Farmout Lands to all depths.

Because the factual background of the issues in dispute occurred in Wyoming, we apply Wyoming state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The purpose of interpretation or construction of any contract is to

ascertain the true intent of the parties. *See Wolff v. Belco Dev.*, 736 P.2d 730, 732

(Wyo. 1987). An inquiry into the parties' intent is limited to the four corners of

the contract so long as the contract is clear and unambiguous. *Amoco Prod. Co.*

*v. EM Nominee P'ship Co.*, 2 P.3d 534, 540 (Wyo. 2000); *Wolff*, 736 P.2d at 740.

A fundamental precept of contract law is that "the words used in the contract are

afforded the plain meaning that a reasonable person would give them." *Amoco*

*Prod.*, 2 P.3d at 540 (citations omitted). "In the absence of any ambiguity, the

contract will be enforced according to its terms because no construction is

appropriate." *Id*.

Our analysis begins with the plain language of the settlement agreement.

Section 3.2 of the Settlement reads as follows:

> PLAINTIFFS and DEFENDANTS have also settled all claims and disputes
> relating to who shall serve as Operator of the Farmout Lands and the
> Non-Farmout Lands, which lands are described in and are subject to that
> certain Farmout Agreement . . . . The surface acreages of the Farmout
> Lands and the Non-Farmout Lands are described in Exhibits "A" and "B"
> hereto, respectively. The Farmout Lands are subject to depth restrictions as
> set forth in the Farmout Agreement and in the Joint Operating Agreements
> ("JOAs") executed contemporaneously herewith. Except as provided in
> Sections 3.4 and 4.1 herein, *the parties agree that [Shell] shall be the*
> *Operator of all wells drilled on a surface location on the Farmout Lands to*
> *all depths,* under the Joint Operating Agreements ("JOAs") that have been
> concurrently signed by the parties hereto . . . . The parties acknowledge
> that the ownership interests underlying the Farmout Lands may vary
> depending upon the depth to which a particular well is drilled on the
> Farmout Lands, and the parties have agreed on a method that will allocate
> all costs of exploration, drilling, operation and production, as well as all
> production revenues, on all wells drilled on the Farmout Lands in a manner
> which is consistent with the ownership interests of the parties at the various

> depths underlying the Farmout Lands where said costs are incurred and such production obtained, said allocation being set forth in the JOAs that the parties have executed contemporaneously herewith.

Aplt. App., vol. 1, at 177-78 (emphasis added). Thus, the unambiguous language of section 3.2 allows Shell the right to operate "all wells drilled on a surface location on the Farmout Lands to all depths." *Id.* at 177. The plain meaning of the provision "to all depths" necessarily includes depths below which Shell holds only a minority interest. Simply stated, if a well is located on the surface of Farmout Lands, Shell operates the well, regardless of depth.

Ultra points out that section 3.2 both references the definition of Farmout Lands as articulated in the 1996 Farmout Agreement, and states that "Farmout Lands are subject to depth restrictions." *Id.* Thus, it argues, the Settlement prohibits Shell from being the operator of any well that has a surface location on Farmout Lands if that well is drilled below the "Contract Depth," *i.e.*, the depth to which Meridian's 75% interest was earned by McMurry. Extended to its logical conclusion, this contention posits that the depth to which Shell can act as operator is limited to the Contract Depth for each block as defined in the Farmout Agreement as follows:

    Block A: NFU 13-2A Well: 12,077 feet
    Block B: Pinedale 1-14 Well: 9,931 feet
    Block C: Pinedale Federal 13-19 Well: 13,000 feet
    Block D: NFU 13-32 Well: 10,200 feet
    Block E: NFU 13-10 Well: 11,660 feet

Aple. Supp. App., vol. 1, at 263.

The problem with Ultra's argument is that nothing in the Farmout Agreement, the Settlement, or the JOAs mandates these cut-offs *for purposes of determining operator rights*. If the parties had intended to prevent Shell's predecessor from operating in depths where it did not own a majority interest, the Farmout Agreement could have clearly stated as much. Instead, the Agreement plainly allowed Shell's predecessor to drill to all depths vertically beneath Farmout Lands, including depths where Ultra's predecessor held a majority interest. Although the Farmout Agreement defines *ownership interests* three-dimensionally to include the Contract Depth of a well, it does not define *operator rights* as limited by the Contract Depth. Rather, operator rights, which are attached entirely to either Farmout or Non-Farmout Lands, are defined two-dimensionally, *i.e.*, by surface area or acreage. Therefore, the plain language of the Settlement dictates that Shell has operator rights to all depths of the Farmout Lands while Ultra has operator rights to all depths of the Non-Farmout Lands.

Notwithstanding the language of section 3.2, Ultra maintains that section 3.4 of the Settlement makes clear that the surface location of the well is not dispositive regarding operatorship. In relevant part, section 3.4 states:

> The parties acknowledge that *restrictions imposed by the Bureau of Land Management or by other regulatory agencies may restrict and limit the number of surface drillsite locations for wells within the area . . .* which could mean that one vertical and *multiple directional wells* may need to be

-18-

drilled from a single drilling pad. Such restrictions could have the result that a well with a surface location on the Farmout Lands may have to be drilled directionally to a legally-permitted bottom-hole location on Non-Farmout Lands or vice versa. Thus, *notwithstanding any provision herein to the contrary*, [Shell] will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Farmout Lands (as defined herein), except Block D which Ultra shall operate subject to Section 4.1, and ULTRA will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Non-Farmout Lands (as defined herein) and on Block D as provided in the Block D JOA.

Aplt. App., vol. 1, at 178-79 (emphasis added). According to Ultra, the

"notwithstanding any provision herein to the contrary" language in section 3.4

demonstrates that the majority interest in the bottom-hole is the bottom line as far

as operator rights are concerned. Section 3.4 makes clear that this section is an

exception to the general rule that surface location determines operator rights,

however. The provisions of 3.4 apply only in the event of directional drilling,

which is the sole situation where the bottom-hole location does determine

operator rights. If the BLM or another agency limits drillsites for wells, Shell

may drill from the surface of Non-Farmout Lands directionally into bottom-holes

on Farmout Lands and maintain operator rights notwithstanding the well sits on

the surface of Non-Farmout Lands. Similarly, if agency regulations so dictate,

Ultra may drill from the surface of Farmout Lands directionally into bottom-holes

on Non-Farmout Lands and operate those wells. The language "notwithstanding

any provision herein to the contrary" indicates that there is a general rule to the

contrary that controls so long as agency regulations do not limit drillsites.  That rule is found in section 3.2 which states: "[e]xcept as provided in Sections 3.4 and 4.1 herein, the parties agree that [Shell] shall be the Operator of all wells drilled on a surface location on the Farmout Lands to all depths."  *Id*. at 177.

The documents that most specifically deal with the parties' operating rights are the JOAs.  As noted above, the Settlement and the JOAs were executed contemporaneously.  *Id*.  (Section 3.2 of the Settlement states "that [Shell] shall be the Operator of all wells . . . to all depths, under the Joint Operating Agreements ("JOAs") that have been concurrently signed by the parties.").  The JOAs define Farmout Lands and Non-Farmout Lands in a manner identical to the Settlement.  *Id*. at 199-200, 234-35; Aple. Supp. App., vol. 2, at 529-30.  Specifically, and in accord with the Settlement, the JOAs do not contain a majority interest limitation on operator rights.  Aple. Supp. App., vol. 2, at 495-535.  In other words, there is no requirement under the JOAs that Shell relinquish operations once it drills below the Contract Depth to which Meridan's 75% interest was earned pursuant to the Farmout Agreement.  *Id*.  Indeed, Shell and Ultra signed a separate JOA detailing the parties' rights and obligations regarding the Non-Farmout Lands.  *See id*. at 529.  The JOA's description of the Non-Farmout Lands for which Ultra is operator is based solely on surface location and does not include lands below the earnings depth of Farmout Lands.  *Id*.

-20-

Consequently, we agree with the district court that the JOAs "evidence the parties' intent that Shell is to operate all wells drilled on the surface of Farmout Lands to all depths" while Ultra is to operate all wells drilled on the surface of Non-Farmout Lands to all depths. *Shell Rocky Mountain Prod.,* 266 F. Supp. 2d at 1337.

For the reasons detailed above, we conclude that the Settlement and JOAs are clear and unambiguous and state a general rule, subject to certain exceptions, that the surface location determines operatorship of the wells in dispute. Thus, we will not consider the parties' extrinsic evidence.

### The Excessive Costs Issue

Ultra's final contention is that the district court erred in barring its counterclaim against Shell for breach of the JOAs by invoking the exculpatory clause of Article V, section A of each JOA. Article V of each JOA includes two relevant provisions to the breach of contract dispute: section A includes a general conduct requirement with an exculpatory clause, while section D includes a specific duty provision. Aplt. App., vol. 2, at 421. The exculpatory clause of section A provides that the operator "shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from

gross negligence or willful misconduct." *Id.*  The specific duty provision of section D requires that the operator (1) incur costs that are commensurate with those incurred by other operators in the contract area to drill and complete wells and (2) drill and complete wells at the generally prevailing rates:

> All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

*Id.*

Ultra alleges that Shell, acting as operator, breached the competitive rate provision of section D by charging drilling costs to the nonoperating working interest owners in excess of the prevailing rates in the area.  Shell's defense is that section A absolves it of all liability under the JOA unless its actions amount to gross negligence or willful misconduct.[6]  Relying exclusively on this court's

---

[6]It is worth noting that in its briefs and motions, Shell argues that an affidavit provided by Shell's Development Manager, Mr. Bryan Lastrapes, demonstrates that there is no genuine issue of material fact regarding the reasonableness of Shell's drilling costs.  According to FED. R. CIV. P. 56(e), "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  In his affidavit, Mr. Lastrapes states, in relevant part:

(continued...)

decision in *Palace Exploration Co. v. Petroleum Dev. Co.*, 316 F.3d 1110 (10th

Cir. 2003), the district court held that the exculpatory clause of section A bars

Ultra's breach of contract claim against Shell. *Shell Rocky Mountain Prod.*, 266

F. Supp. 2d at 1337 ("[t]he *Palace* decision applies directly to the issue the Court

is deciding here. As the Tenth Circuit held, this exculpatory clause bars suit

---

[6](...continued)
*To the best of my knowledge* there is no posted, "prevailing rate" that are charged by drilling contractors in he Pinedale area. Shell's drilling contractor charges its services based upon their normal rates. *I believe* that the rates charged under the drilling contract for Shell's Pinedale activity compare favorably to, and are within the range of, rates charged by other operators.

Aple. Supp. App., vol. 2, at 541 (emphases added). Mr. Lastrapes' submission that he "believes" Shell's rates are comparable to rates of competitors drilling in the area proximate to the Pinedale Anticline simply does not satisfy the personal knowledge requirement of Rule 56(e). *Tavery v. United States*, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994) ("Under FED. R. CIV. P. 56(e), only statements 'made on personal knowledge' will support a motion for summary judgment; statements of mere belief must be disregarded."). Therefore, Shell's contention that undisputed facts prove that it has not breached the competitive rate provision of the JOAs is unpersuasive.

Shell also contends that Ultra has no standing to complain about well costs because it chose not to participate in the wells once it was made aware of Shell's cost estimate. We disagree. A party that refuses to consent does not forever relinquish its interest in the well to the consenting parties. Relinquishment lasts only until "payout," the point at which the consenting parties have recovered a percentage – here 300% – of the well's cost. This percentage is commonly referred to as the "nonconsent penalty" and is found in Article VI, section B(2) of the JOAs. Aple. Supp. App., vol. 2, at 501-2. Once payout is reached, nonconsenting parties are entitled to begin receiving production revenue commensurate with their ownership interest. *Id*. It therefore follows that if Shell is incurring excessive costs, as alleged by Ultra, both the amount of revenue and the date at which Ultra will receive any revenue are directly affected. Thus, Ultra has standing to sue for breach of the competitive rate provision of the JOAs.

against an operator for breach of contract, or for anything else other than willful acts or gross negligence"). According to the district court,

> [*Palace*] held that the plaintiff "did not articulate any theory of recovery whereby it could recover legal damages based on breach of contract, for the above-referenced exculpatory clause limited [the defendant's] potential liability to willful acts or acts that resulted from gross negligence."

*Id*. (citing *Palace*, 316 F.3d at 1114).

The district court's decision to bar Ultra's excessive costs claim on the basis of the exculpatory clause in section A of the JOAs constitutes reversible error for two reasons. First, Ultra is correct to assert that the district court misconstrued the *Palace* decision. The language quoted by the district court is found in the "Background" or facts section of *Palace* and thus does not represent a holding of this court. *Palace*, 316 F.3d at 1114. Indeed, the "facts" quoted from *Palace*, which were recited by this court to explain why the plaintiff selected only certain claims in its complaint, were not relevant to the legal analyses in that case. *Palace* also did not address the scope of the JOA exculpatory clause.[7]

---

[7]This court's more recent decision in *Palace Exploration Co. v. Petroleum Dev. Co.*, 374 F.3d 951 (10th Cir. 2004) (*Palace II*), supports our analysis and clarifies the holding of *Palace Exploration Co. v. Petroleum Dev. Co.*, 316 F.3d 1110 (10th Cir. 2003) (*Palace*). In *Palace II*, the court stated:
> Appellant admits that "neither party disputed [at the district court level] that the exculpatory clause of the joint operating agreement set the standard for determining PDC's liability as operator for breach of duties *not affirmatively set forth in the agreements*."
*Id*. at 954 n.2 (emphasis added). In the instant case, the exculpatory clause does not set the standard for determining Shell's liability for excessive drilling costs

(continued...)

-24-

Second, the district court did not discuss relevant circuit case law regarding the scope of JOA exculpatory clauses. In *Amoco Rocmount*, we construed an exculpatory clause – nearly identical to one at issue in the instant case[8] – and its application to breach of *express terms* in JOAs. 7 F.3d at 922-23. We rejected the plaintiff's contention that the exculpatory clause applied to "nonperformance of duties imposed by the contract," such as the duties at issue here:

> We would have no trouble upholding the application of [the exculpatory clause] if this case involved tortious acts related to the performance of the contract, such as an error in dealing with a third party that caused loss to the whole operation. But the issues in the instant counterclaim, and in the two other counterclaims to which Amoco seeks to apply the clause, relate to actions taken deliberately and, as the district court found, in breach of the contract involving shifting costs between the contracting [entities]. Applying strict construction we do not believe the exculpatory language applies to these counterclaims. *The breaches at issue here are nonperformance of duties imposed by the contract, and do not hinge on whether the breaching party's failure to perform was negligent, grossly*

---

[7](...continued)
because there is *an express contractual provision* directly on point in Article V, section D of the JOAs. *Palace* is inapposite as it involved implied contractual duties rather than express provisions.

[8]The clause at issue in *Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909 (10th Cir. 1993), stated in relevant part:
> The Unit Operator shall conduct all operations hereunder in a good and workmanlike manner and in accordance with prudent operating practices but the Unit Operator shall not be liable to the Parties for any losses, costs or expenses resulting from any act or omission on the part of the Unit Operator, its agents or employees, save and except such losses, costs or expenses which shall result from the gross negligence or willful misconduct of the Unit Operator, its agents or employees.

*Id*. at 922.

-25-

*negligent, or willful.*

*Id*. at 923. Thus, the exculpatory clause has no application to claims that an operator has failed to abide by specific and express contractual duties assigned in the JOA. Rather, it applies to tortious actions and, as the section A clause plainly states, implied duties that come with the covenant of good and workmanlike performance.

Both parties cite law professor and noted oil and gas commentator Gary Conine's article, *The Prudent Operator Standard: Applications Beyond the Oil and Gas Lease*, 41 NAT. RESOURCES J. 23 (2001), as support for their respective interpretations of the scope of the JOAs' exculpatory clause. *See* Aplt. Br. at 28-29; Aple. Br. at 29-31. In addressing exculpatory clauses exactly like the one at issue here, Mr. Conine is concerned with the construction of the requirement that the operator "shall conduct . . . operations in a good and workmanlike manner." Conine, *supra*, at 67. According to the professor, the exculpatory language limiting liability to "gross negligence and willful misconduct" implies that a standard more similar to "the business judgment rule" than the "prudent operator" standard should apply to claims that an operator performed in less than a "good and workmanlike manner." *See id*.

A thorough perusal of Mr. Conine's article makes it clear that all of Shell's quotations derived from that source come from the professor's discussion of an

operator's liability for performing in less than a "good and workmanlike manner," *i.e.*, the discussion of an operator's liability for breaching the *implied duties* that go hand in hand with the good and workmanlike manner covenant. Indeed, none of Mr. Conine's language cited by Shell is directed at *express contractual provisions*. Moreover, Shell argues that Mr. Conine's article supports its contention that the evolution of standard JOA language included the deletion of an exception for "breach of contract" in the exculpatory clause specifically to preclude a non-operator from suing an operator for breach of contract. Aple. Br. at 29-30. Mr. Conine maintains in his article, however, that the deletion of that language occurred as a result of concern that courts would imply standard contract terms, such as the prudent operator standard, into modern JOAs. *See* Conine, *supra*, at 67 & n.163.

Mr. Conine also addresses this court's *Amoco Rocmount* decision and favorably contrasts it with the more expansive interpretation of the standard exculpatory clause by the Fifth Circuit in *Stine v. Marathon Oil Co.*, 976 F.2d 254 (5th Cir. 1992). The *Stine* court held, much like the district court in this case, that the exculpatory clause bars suits for breach of express contractual terms. *See id.* at 261. As Mr. Conine explained:

> [t]he restrictive interpretation of the exculpatory clause in the [*Amoco Rocmount*] decision applies to express provisions in the operating agreement where the parties have clearly negotiated an allocation of risks and costs. Consequently, the one area in which [*Stine*] and [*Amoco*

*Rocmount*] are in agreement is the application of the exculpatory clause to those "operations" that are the subject of the paragraph containing the exculpatory clause. This would include implied duties arising from the covenant to perform those "operations" in a good and workmanlike manner. Restricting [*Stine*] in this fashion allows a more sensible application of the exculpatory clause. It is difficult to perceive why the parties would include explicit and detailed directions on administrative matters that are supplemental to "operations" if they did not intend the operator to be liable for breach of those matters. This is particularly true because the performance of those administrative duties does not generally involve extraordinary risks against which the operator should be protected. Performance of "operations" and implied duties connected with those operations are another matter. The operating agreement does not function well if the risks associated with these activities are borne by the operator alone.

Conine, *supra*, at 68 n.168. Incurring costs at a rate commensurate with those of other operators in the area is clearly one of those "administrative duties" that does not "involve extraordinary risks" to Shell. *Id*. Moreover, it would make little sense for the parties to include detailed directives concerning what the operator can and cannot do in incurring costs if the parties did not intend to be legally bound by them. While a higher standard for breach might apply to drilling, extraction, and other risky "operations" because most operators have the same incentive as non-operators to do well in physical operations, it is nonsensical to apply such a standard to administrative and accounting duties where the operator can profit by cheating, or simply overcharging, its working interest owners. We hold that the exculpatory clause does not bar Ultra's counterclaim for breach of the JOAs.

We **AFFIRM** the district court's grant of summary judgment to Shell on the operatorship issue, but we **REVERSE** it on the excessive costs issue and **REMAND** that claim to the district court for further proceedings consistent with this opinion. We also **DENY** Shell's motion to supplement its appendix.